# CHARLESTON

## GERMER v. TRIPLE-STATE NATURAL GAS & OIL CO.

### Submitted September 13, 1905.    Decided April 24, 1906.

1. CORPORATIONS—*Stockholders Meeting—Estoppel.*

   A stockholder in a corporation, who is present and participates in a meeting of the stockholders thereof, is estopped to deny the legality of such meeting.    (p. 150.)

2. SAME—*Sale of Property—Payment.*

   Under the provisions of the statutes of West Virginia as amended and re-enacted by chapter 35, Acts of 1901, a corporation "On the affirmative vote in person or by proxy, of the holders of at least sixty per centum of the outstanding stock of the corporation, may sell, transfer or assign in good faith all of its property and assets," and may accept in-payment therefor the stock, bonds or other securities of any joint stock company.    (p. 151.)

3. SAME.

   The provisions of chapter 35, of the Acts of 1901, apply alike to all corporations which are subject to chapters 52, 53 and 54 of the Code, whether incorporated prior or subsequent to the passage of said chapter 35 of Acts of 1901).    (p. 152.)

Appeal from Circuit Court, Cabell County.

Bill by Edward G. Germer and others against the Triple-State Natural Gas & Oil Company and others.    Decree for defendants, and plaintiffs appeal.

*Affirmed.*

LOUIS ROSENWEIG, H. L. MOORE, and SIMMS & ENSLOW, for appellants.

MACCORKLE & CHILTON, HOLT & DUNCAN, PAM & HURD, McCOMAS & NORTHCOTT, and MOLLOHAN, McCLINTIC &. MATHEWS, for appellees.

McWHORTER, PRESIDENT:

Triple-State Natural Gas and Oil Company was chartered by the State of West Virginia on the 5th day of May, 1898, "For the purpose of acquiring, owning, leasing, holding, developing and disposing of lands, and interest in lands containing, or supposed to contain, oil or natural gas, or both, or of acquiring, owning and operating all such pipe lines, and other instrumentalities as may be necessary and desirable, or either, in the production, transportation, consumption, sale, and delivery of oil or natural gas, or both, and of doing all other lawful acts necessary or believed to be necessary or of use or believed to be of use in carrying out the objects of the said proposed company, and of the business which may be connected therewith in the production, transportation, sale and delivery of oil and natural gas, or either one hereof." And was duly organized with a capital stock of two million dollars, with two hundred thousand dollars paid in, with privilege of increasing the capital stock to five million dollars in all, by the sale of additional shares of one hundred dollars each. On the 6th day of February, 1905, a special meeting of the stockholders was called, at which meeting one O. D. Bleakley made to said meeting of stockholders the following proposition:

"*To the Triple-State Natural Gas and Oil Company:*

"GENTLEMEN:—I hereby offer to purchase and acquire from you, each and all of the property, assets and things of value belonging to your company, upon the following terms and conditions:

"1. By the term 'property, assets and things of value,' I mean all of the real property, all of the gas and oil leases, rights and privileges, mains, pipe lines, machinery, implements, apparatus, furniture, fixtures, supplies and every species of real and personal property; your books, bills, notes, stocks, bonds, moneys, bills receivable, accounts receivable, contracts, ordinances, franchises, rights of way, and

each and every species of property, right privilege or thing of value, real, personal or mixed, tangible or intangible, legal or equitable, wheresoever situated and in whatsoever form, whether held in your name, or the name of others for you, it being intended that I shall take over your business as a going concern.

"2. A corporation is about to be organized under the laws of the State of West Virginia, which corporation will acquire the property and assume the liabilities of your company and of the Kanawha Natural Gas, Light & Fuel Company, the latter company having outstanding capital stock to the amount of $500,000 and bonds to the amount of $330,-000. The new corporation will be authorized to issue Three Million Dollars ($3,000,000) par value of capital and Three Million Dollars ($3,000,000) six per cent. fifteen-year gold bonds secured by a consolidated mortgage upon all the property of the companies thus acquired; subject, however, to the lien of such of the outstanding bonds of your company and of the Kanawha Natural Gas, Light and Fuel Company as shall not be surrendered for the consolidated bonds of the new company. For the property of your company which I hereby offer to purchase, I agree to pay you the sum of $1,-000,000, par value of the stock of the said new corporation fully paid and non-assessable.

"3. As a further consideration of the transfer of your property to me, or to said new corporation, I will also cause said new corporation to assume and agree to pay, discharge, carry out and perform each and all of the debts, liabilities, contracts, obligations and undertakings of your company (other than the liability of your company to its stockholders on account of their respective stockholdings), including your outstanding bonded indebtedness.

"4. In order that your company and all its stockholders may be fully advised of my connection with the transaction, and of all profits to be derived by me therefrom, I beg to advise you that I have arranged, that I shall transfer, or cause to be transferred, the property of your company, and the property of the Kanawha Natural Gas, Light & Fuel Company to said new corporation, and to pay to said new corporation $1,249,000 in cash, in consideration of the issuance to me of $2,999,000 of its capital stock, ($1,000 having been

subscribed for the corporators and paid in cash), and $1,250,-000, par value, of its said proposed bonds. The remaining bonds will be reserved and used for the following purposes:

"$956,000 par value thereof, for the purpose of being used at par to exchange for or retire the present outstanding bonds of your company, amounting to $626,000; and the present outstanding bonds of the Kanawha Natural Gas, Light & Fuel Company, amounting to $330,000; $794,000 of said new bonds are to be reserved for the future corporate needs of the new company.

"Of the stock to be issued to me, $1,000,000 thereof will be issued and delivered to me by your company in payment for its property, as provided in this offer; and $666,000 thereof will be issued and delivered by me to the Kanawha Gas, Light & Fuel Company in payment for the property of that company.

"$84,000 of said stock and $1,000 par value of said bonds will be retained by me for my own individual use, as a profit derived by me out of the transaction.

"The $1,249,000 to be paid by me to the new company will be raised by the sale of $1,249,000 of the bonds issued to me and $1,249,000 par value of the stock which will be sold by me to various persons (most of whom are now interested as directors or stockholders, or both, in one of the other of the old companies above mentioned), at the rate of one bond and ten shares of stock for each $1,000 subscribed.

"I have arranged that all persons who are stockholders of your company or of the Kanawha Natural Gas, Light & Fuel Company, shall be permitted, if they so desire, to share in the purchase of said bonds and stocks, so to be sold, upon the following terms:

"The stock issuable to your company, and to the Kanawha Natural Gas, Light & Fuel Company, aggregates $1,666,000. Each person who, at the date of the mailing of the notice hereinafter referred to, is a stockholder of either of said companies, shall be permitted, in the proportion which the stock of the new company issuable to him bears to the total amount of $1,666,000, to subscribe for the bonds and stock issuable to raise said $1,249,000 cash as aforesaid, provided he makes such subscription and payment at the time, place and in the

manner designated in the notice mailed to him at the address shown on the books of the old company, stating the amount to which he is entitled to subscribe. Subscriptions for fractional parts of a bond will not be received; but stockholders entitled to such fractional subscriptions may combine their subscription rights. Any such stock and bonds not ratably subscribed and paid for by the stockholders of the old companies, will be subscribed and paid for by other persons, some of whom will be stockholders or directors, or both, of the new and old companies, or one or more of them, and who will be permitted upon making such purchase, to hold and dispose thereof as their own property without accountability to anyone.

"5. The conveyance of the property of your company shall, at my election, be made either to me, or my nominees, or to the new company.

"6. The acceptance of this proposition, in writing, will constitute a contract between us.

"Dated February 6, 1905.

"O. D. Bleakley."

At said meeting of stockholders the proposition of Mr. Bleakley for the purchase was by resolution accepted by a vote of thirteen-thousand three-hundred and thirty-two shares against four-thousand nine-hundred and seventy-nine shares against the proposition. On the 17th of February, 1905, Edward G. Germer, in his own right and as administrator of the estate of Otto Germer, deceased, and of Otto Germer who sued for and on behalf of themselves and all other stockholders of Triple-State Natural Gas and Oil Company, and on behalf of themselves and all other holders of mortgage bonds of said company who might come in or be made parties to the suit and contribute to the cost thereof, filed their bill in equity in the circuit court of Cabell county against the Triple-State Natural Gas and Oil Company, W. O. Johnson, president and director, and J. B. Moorhead, secretary thereof, O. D. Bleakley, Charles Miller, trustee, and Charles Miller in his own right and as director in the said company, J. E. French, George Miller and George Maloney, directors of said company, the Central Trust Company of New York, a corporation, and all the unknown bondholders and creditors of the Triple-State Natural Gas and Oil Company, alleging

the attempted sale of all the property and assets of said corporation and the opposition of the minority of the stockholders to such sale and praying that an injunction might be awarded restraining, enjoining and inhibiting the said Triple-State Natural Gas and Oil Company, W. O. Johnson, president, J. B. Moorehead, secretary, and said O. D. Bleakley and Charles Miller and all of the directors of the said defendant Triple-State Natural Gas and Oil Company, their agents, officers and servants, each and all of them individually, severally and collectively from in any manner proceeding to carry out the said illegal merger and sale of the said properties of said company to either the said O. D. Bleakley or the said United States Natural Gas Company or either of them, and that the defendants, the Triple-State Natural Gas and Oil Company, its officers and agents be inhibited and enjoined from turning over to the United States Gas Company, the proposed new company, or to Bleakley or any other person or persons the property of the said defendant Triple-State Company, or delivering the same or any part thereof to any person or persons under said scheme of sale, merger or transfer, until the further order of the court or the judge in vacation; that the Triple-State Company, its officers, agents, etc., be restrained and enjoined from doing any act to prevent the full and sufficient amount of gas being supplied by and through its mains to its consumers and from doing any act or acts that lead to or have a tendency to injure the property of the defendant Triple-State Company or to diminish the supply of gas furnished, and that they be affirmatively required to do every and all acts that might be in their power, necessary to carry into effect the purposes of their franchise and supply their consumers with gas, and that they be restrained from dividing or attempting to divide the property, assets, franchises and rights of property among the several stockholders of the Triple-State Company or in any manner interfering therewith, and from carring out any dissolution that might be decided upon or agreed upon at the meeting on the 20th of February, 1905, until the further order of the court and until the rights and interest of the several parties in the property might be, by the court, judicially ascertained and fixed, and the rights of all the stockholders fully protected in the premises; that in case the stockholders

on the 20th of February should undertake to make such dissolution that no action might be taken thereunder by the officers of the Triple State Company until the rights of all persons interested could be judicially ascertained and determined and the proper distribution agreed; that a receiver be appointed of all the property and property rights, etc., of said Triple-State Company; that said property might be, by and under the direction of this Court, taken care of and preserved, until the final disposition thereof and rights of all parties ascertained under the direction of the court on the final hearing, and for general relief.

The defendants, Triple-State Gas and Oil Company, W. O. Johnson, president and director, and J. B. Moorehead, secretary of said company, O. D. Bleakley and Charles Miller, in his own right and as director of the Triple-State Company, filed their answer denying many of the material allegations of the bill, but admitted the attempted merger and transfer of the said Triple-State Company to the new company called the United States Natural Gas Company, and admitted the protest against such sale and merger on the part of the minority stockholders of the Triple-State Company. Affidavits were filed by the plaintiffs and the defendants and notice of motion was given to dissolve said injunction. On the 28th of February, 1905, the cause was heard in vacation on the bill and exhibits and the said answer which was treated as an affidavit, upon the several affidavits filed by the respective parties and upon the cross-examination of such of the affiants as were cross-examined, and the re-examination, upon which hearing the court dissolved the injunction granted in this cause. From which decree the plaintiffs appeal and say that the court erred to their prejudice in that the notice of the stockholders meeting was not given as provided by the statutes of West Virginia or by the by-laws of the said company and because the statute under which a sale was proposed to be made by section 83 added to chapter 54, by the Acts of 1901, was not passed until after the charter of the Triple-State Natural Gas and Oil Company was granted and after the contract rights between the stockholders had taken effect and because the said act of 1901, permitting the sale of all the property of a corporation organized under the laws of the State of West Virginia upon an affimative vote of sixty

per cent. of the stockholders after due notice does not permit or allow such sale to be made for anything except cash and the plaintiffs could not be required to accept in payment for their stock in the old company, stock in any new company.

As to the assignment in error, the want of proper notice of the meeting of stockholders at which action was taken, in relation to the sale and merger. The record shows that the plaintiffs were present and participated in the proceedings voting their stock against the proposition and entering their protest against the action of the majority, and none of the stockholders not represented at said meeting are complaining of the majority. "All who participate in a meeting are estopped to question the regularity, and the corporation itself may, as to third persons, be estopped to deny the legality of a meeting." 26 A. & E. E. L. (2nd Ed.) 995; 10 Cyc. 326; *Handley* v. *Stutz*, 139 U. S. 417. This assignment is not well taken.

Did the stockholders have the right, under the laws of West Virginia, to vote and sell all the property of the corporation and take in payment the stock and bonds of another corporation? It is conceded that prior to the Act of 1901, no such power existed under our statute in the stockholders to so dispose of their property, but it is claimed that under section 83, added to chapter 54 of the Code, by chapter 35, Acts of 1901, full power was granted to so sell and dispose of the property of the corporation by the holders of at least sixty per centum of the outstanding stock of the corporation and to transfer the same, taking in payment therefor the stock of another corporation. It will be seen that the said section 83 provides that holders of sixty per centum of the outstanding stock of the corporation may sell, transfer or assign in good faith all of its property and assets, and while it does not expressly and in terms, authorize the corporation to take in payment therefor the stocks or bonds of another corporation; yet with the full power to sell, transfer or assign in good faith all of its property and assets under the said new section 83, it would seem clear that under the provisions of section 3, chapter 52 of the Code, as amended by said chapter 35 of the Acts of 1901, the corporation has full power to subscribe for, or purchase the stock, bonds or securities of any joint stock company, this, it can do, upon a

majority vote of the stock, by plain implication. Having·
the right to sell, transfer and assign all its property under
section 83, and, under said section 3, chapter 52, as amended,.
having the right to subscribe for, or purchase the stock,.
bonds, or other securities of any joint stock company, it·
would follow as a necessary sequence that it could take the
one in payment for the other. In *Traer* v. *Lucas Pros-
pecting Co.*, 99 N. W. 290 (Iowa), Syl. pt. 4, it is held:
"Where the charter of a corporation gave it power to sell all
its property, and also authorized it to deal in the stock of
other corporations, it had the right to sell all of its property
for stock in another corporation." Sherwin, J., at page 294
says: "The Lucas Company having the power to sell and
transfer all of its property, and the power to purchase the·
stock of another corporation, it follows that it had the power
to so invest all of its property." And in *Metcalf* v. *Furni-
ture Co.*, 122 Fed. Rep. 115 (Syl. pt. 9), it is held: "Where
a corporation· is given by its charter the right to dispose of
its property and to discontinue its corporate existence, it has
the power to accept stock in another corporation in payment
of the purchase price of its property, provided the transaction
is *bona fide.*" And in the same case (Syl. pt. 5), it is held:
"Where the charter and bylaws of a corporation and the,
statutes of the state under which it is organized, vest in a,
majority of the stockholders the right to sell the property of·
the corporation and to discontinue its corporate existence,.
every stockholder takes his stock subject to such right; and·
a minority stockholder must submit to the action of the ma--
jority in exercising such power, in the absence of fraud.'"
And in *Treadwell* v. *Manufacturing Company*, 7 Gray.
(Mass.) 393, (66 Am. Dec. 490), it is held: "The directors
of a manufacturing corporation, as the best means of con-
tinuing the business, and pursuant to the votes of a majority
of the stockholders, though against the protest of a minority,
may sell the whole property of the corporation to a new cor-
poration, taking payment in shares of the new corporation,
to be distributed among those of the old stockholders who are
willing to take them." Section 1, chapter 52, of the Code,
provides that, "Every corporation as such shall have succes-
sion by its corporate name for the time limited in its charter,
or by law; and if no time limited, perpetually. * * *

Contract and be contracted with, by simple contract or specialty; purchase, hold, use and grant estate real and personal.'' It will be seen that the power to sell and convey is as broad as its power to purchase and hold; the word "grant" being the equivalent of "convey" and similar terms.—9 Cyc. 859; 14 A. & E. E. L., 1111; 4 Words & Phrases, 3151; *State ex rel. Orr* v. *City of New Orleans*, 24 Southern Rep. 666, 50 La. Ann. 880. In case of *Ditch Co.* v. *Zellerbach*, 37 Cal. 543, 99 Am. Dec. 300, Sawyer, C. J., speaking for the court, says: "The *jus disponendi* necessarily attached as an incident to the ownership. The very idea of private property, in which the public has no rights, involves the idea of a right to sell and convey, when the exigencies of the corporation require it. If a corporation could convey a part, it could convey the whole." Section 1, chapter 54, Code, provides: "Joint stock companies incorporated under this chapter shall be subject to the provisions of the fifty-second and fifty-third chapters of the Code, so far as the same are applicable."

When the Triple-State stock was subscribed for by the stockholders they did so charged with a full knowledge of the statutory provisions then existing under which the legislature might, at any time, alter, amend or repeal the provisions of the law which were made a part of the charter. The powers reserved to the legislature are plain and distinct and any amendment or alteration made subsequent to the formation of the corporation and made within the scope of the reserved powers were written into the charter as certainly as the restrictions and rights and powers of the stockholders and the corporation itself existing at the time of the incorporation. It is contended by appellants that section 83 added to chapter 54, and the amendment to section 3 of chapter 52 being enacted subsequent to the organization of the Triple-State Company said corporation and the stockholders thereof are not subject to the provisions thereof; in other words, corporations, existing prior to the enactment of chapter 35, Acts of 1901, are not affected by it, or subject to its provisions. If this proposition were correct we should have two classes of corporations operating and subject to two sets of laws. This question seems to be well settled in the case of *Cross* v. *Railway Company*, 35 W. Va. 174. By act of the

Legislature of West Virginia of February 26th, 1866, "The Potomac and Piedmont Coal and Railroad Company" was incorporated. On the 22nd of August, 1872, the Constitution of this State was adopted, which provided in section 4, Article 11: "The legislature shall provide by law that in all elections for directors or managers of incorporated companies every stockholder shall have the right to vote in person or by proxy for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of the shares of his stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner."

At the election of directors in the winter of 1891 by this system, provided for in the Constitution and the statute made in pursuance thereof, W. Irvine Cross was elected a member of the Board of Directors of the said railroad company, whose name had been changed to that of the West Virginia Central & Pittsburg Railroad Company; while Thos. B. Davis had been declared elected under the old system of voting the stock in vogue at the time of the incorporation of the company, he and the company contending that the new provision did not apply to the corporations which already existed at the time of the adoption thereof. Cross sued out his writ of *mandamus nisi* to require the company and its officers to recognize him as a director in said company in the place of said Davis, and the court held that the new provision was applicable and that Cross was duly elected thereunder, and the peremptory *mandamus* was issued accordingly.

The broad reservation to the legislature to "Amend, alter or repeal" the provisions of the statute under which corporations operate are as though written into every charter issued thereunder, and every subscriber to the stock of any such corporation is charged with full knowledge of the provisions of the law then existing, under which the legislature might, at any time, amend, alter or repeal the provisions of the law which were so made a part of the charter, and such subscriber must be held to have given his consent that such

change might at any time be made by the legislature. This being true, it cannot be claimed, with good reason, that by such action the legislature would be impairing the obligation of any contract the subscriber entered into when he became a stockholder.—4 Thomp. on Corp., section 5408.    In *Allen* v. *Ajax Mining Company*, 77 Pac. Rep. 47, decided in Montana in 1904, a case very similar to the one before us, Holloway, J., in delivering the opinion of the court, says: "It is to be understood, too, that this reservation possesses equal vigor, whether contained in the charter of the particular corporation itself, or in the Constitution or general laws of the state under which the corporation is organized.    While there may be some slight conflict in the authorities, the great weight of authority clearly and unequivocally sustains such statutes.   *Market Street Ry. Co.* v. *Hellman*, 109 Cal. 571, 42 Pac. 225; *Looker* v. *Maynard*, 179 U. S. 46, 21 Sup. Ct. 21, 45 L. Ed. 79, and cases cited: *Northern Central Railroad Co.* v. *Maryland*, 187 U. S. 258, 23 Sup. Ct. 62, 47 L. Ed. 167; *Venner Co.* v. *Steel Corporation*, (C. C.) 116 Fed. 1012.    The theory upon which these statutes are upheld is that whatever rules or regulations for the management, operation or control of a corporation which the legislature might have incorporated in the law under which the corporation was organized may afterwards properly be engrafted on its charter by virtue of this reserved power existent at the time of the formation of the corporation.    *Sinking Fund Cases*, 99 U. S. 700, 25 L. Ed. 496; *Spring Valley Water W.* v. *Schottler*, 110 U. S. 347, 4 Sup. Ct. 48, 26 L. Ed. 173; *Market Street Ry. Co.* v. *Hellman*, above; *McGowan* v. *McDonald*, 111 Cal. 57, 43 Pac. 418, 52 Am. St. Rep. 149; *Williams* v. *Nall*, (Ky.) 55 S. W. 706.    A review of the authorities citing numerous instances of the enforcement of such statutes is found in 4 Thompson on Corporations, Par. 5411."

For the reasons herein stated, we conclude there is no error in the decree and the same is affirmed.

*Affirmed.*

POFFENBARGER, JUDGE, (*dissenting*:)

E. G. Germer, in his own right and as administrator, and Otto Germer have appealed from an order made in vacation

by the judge of the circuit court of Cabell county on the 28th day of February, 1905, dissolving an injunction which had been awarded on their bill on the 17th day of February, 1905, inhibiting and restraining the Triple State Natural Gas and Oil Company, its directors, officers, agents and servants, as well as certain individuals named, from effectuating, on the part of said company, a merger and consolidation of the same with a new and different corporation, known as the United States Natural Gas Company, upon the terms and conditions specified in a proposition of purchase, made by one O. D. Bleakley, to the stockholders of the Triple State Natural Gas and Oil Company, assembled in a special meeting for the purpose of considering the same, which proposition was for the purchase, by said Bleakley, of the entire plant, franchises and all the property of said company, as a means of transferring the same to said new corporation.

Said proposition, submitted on the 6th day of February, 1905, represented that a corporation was about to be organized, under the laws of the State of West Virginia, to acquire the properties and assume the liabilities of the Triple State Natural Gas and Oil Company and of the Kanawha Natural Gas, Light and Fuel Company, and would be authorized to issue three million dollars par value of capital stock and three millions of six per cent. fifteen year gold bonds, to be secured by a consolidated mortgage upon all the property of the companies so to be acquired by it, subject to the lien of such of the outstanding bonds of the Triple State and Kanawha companies as should not be surrendered in exchange for the consolidated bonds of the new company. The amount offered for the Triple State property was one million dollars, payable in the stock of the new corporation fully paid and non-assessable, at its par value; and the company was to assume and agree to pay all the debts and liabilities of the Triple State Company and discharge and carry out and perform all its contracts, obligations and undertakings, except the liability of the company to its stockholders on account of their respective stock holdings. At that time, the capital stock of the Triple State company was two million dollars and it had a bonded indebtedness of $626,000. The bonded indebtedness of the Kanawha Natural Gas, Light & Fuel Com-

pany amounted to $330,000 and for its property it was proposed to pay $660,000 in the stock of the new company.

The object sought to be attained by the combination of the properties, franchises and rights of the two companies in the hands of the United States and Natural Gas Company, was the uniting of two large gas fields for the supplying of natural gas to the cities of Charleston and Huntington, West Virginia, Ashland, Kentucky, and Ironton, Ohio, and many small towns and villages in the vicinity of these places. The gas field of the Triple State Company was located partly in Kentucky and partly in West Virginia, on both sides of the Big Sandy River. That of the Kanawha company was in Roane county, West Virginia, some distance from the city of Charleston. The new company contemplated the laying of a large pipe-line from the Roane county field to Huntington, where connection with the pipe-line of the Triple State Company was contemplated.

There is no pretense that the primary object of this effort to combine the two fields and take over the assets of the two companies was other than what is above stated. Though the answer of the Triple State Company represents a decreasing supply of gas in its field, in consequence whereof it is predicted that, in the course of a few years, the income will probably not exceed the operating expenses, it is not, and cannot be, denied that the business is a growing and prosperous one at this time. As shown by the books of the company, its net earnings for the year ending May 31, 1903, were $111,778.68, and for the year ending May 31, 1904, $139,116.91. It increased its surplus to $449,007.57, as of that date. At a meeting of the stockholders held June 13, 1904, the president, W. O. Johnson, submitted a report in which, among other things, he represented the plant to be worth two million dollars with a bonded indebtedness of only $650,000; and in which he estimated the probable future earnings of the company until the year 1917, at $295,000 annually until the year 1910, and at $300,000 annually for the balance of the period, making a total of $3,875.000, which, after paying all operating expenses, interest and bonded indebtedness, would leave a surplus of $1,847,000. There had been some complaint on account of the meager-

ness of supply to customers, in the winter of 1904 and 1905,. but as to the cause of that difficulty, there is much controversy, it being contended by the plaintiffs that it was the result of improper conduct on the part of the management, in an effort to produce a semblance of cause for dissolution of the corporation or sale of its property. This is denied by the defendants, who attribute the shortage in supply to decreased pressure in the field, indicating exhaustion of supply. As there is controversy respecting this matter and the order appealed from is one made in vacation, and not on final hearing, we deem it unnecessary to determine this question of fact. It is involved in so much doubt and uncertainty, to say the least of it, that, if it constituted the sole ground upon which the injunction should stand or fall, the court should have allowed it to stand until final hearing.

The controlling question in the case is whether these dissenting stockholders may prevent, by injunction, the sale of the company's entire plant, all its property, rights and franchises in the manner proposed. That a corporation, on an affirmative vote, in person or by proxy, of stockholders holding at least sixty per cent. of the outstanding stock may sell all of its property and assets is not denied. Section 56 of chapter 53 of the Code gives such power in express terms, but it is said that statute has no application to this corporation because it was passed after its organization. That more than sixty per cent. was voted for the acceptance of the proposition made by Bleakley is a fact uncontroverted. The total number of shares represented in the meeting was 18,311, of which 13,332 were voted in the affirmative. 20,000 being the total number of shares, 12,000 would have been sufficient, had all the shares been voted. Conceding, for the argument, the power of a majority to sell and dispose of the property and their desire to do so, the plaintiffs deny that they have any power to make the sale in the manner in which they are attempting to effect it. They say the authority vested by the statute contemplates a sale for cash or on a credit for money, and not a barter or exchange for the stock of another company. In other words, their contention is that the stockholders representing sixty per cent. of stock, in executing the power of sale vested

in them, must determine the value of the property by the legal standard of value, and are not at liberty to convert the property into another form, destroy its identity, substitute something in its place, at a valuation deemed by them to be of equal value, and compel the stockholders who are opposed to the sale, to take their *pro rata* share of the substituted property, or take the value of the stock out of the stock of the new corporation, standing in lieu of the company's property. The defendants attempt to meet this issue on two grounds: first, an alleged common law right and power in the majority of the stockholders of a corporation to make sale of its entire property and assets and take in payment thereof the stock of another corporation; and second, the provision of section 3 of chapter 52 of the Code, as amended by section 1 of chapter 35 of the Acts of 1901. Said section reads as follows: "No corporation shall be incorporated for the sole purpose of purchasing real estate in order to sell the same for profit, nor shall it, except by a vote of its stockholders regularly had, subscribe for or purchase the stock, bonds or other securities of any joint stock company, or become surety or guarantor for the debt or default of such company." These contentions necessarily carry our inquiry into wide fields of constitutional, statutory and common law. Fortunately, however, several important propositions are not controverted.

Every private corporation includes the element of contract among the stockholders. Its distinctive characteristics are the limited nature of that contract, the power of representation conferred by it and the special privileges, granted by the state, in allowing the parties to make and execute such a contract. The law, conferring the privileges, enables natural persons to associate themselves together, in a relation of contract with one another, for the accomplishment of one or more purposes specified and defined by that contract. It is not in all respects the creature of law. Even when a legislative act, special in its nature, authorizes certain persons to form a corporation, for the purpose of carrying on certain business, and confers upon them the requisite powers, the corporation is not, by force of that statute, created. The persons who are thus enabled to form the corporation must come together, accept the provisions of the act, and associate

themselves together for the purpose of carrying it into effect. Thus, by their voluntary act, under the privilege extended by the state, they form a corporation by contract. Without any legislative permission, they could combine their energies, ability and means for the accomplishment of the same purpose and would thereby form a co-partnership. Their relations with one another and to the business and property would be the same in the one instance as in the other, except so far as the legislative act under which they unite as corporators, limits or varies those rights and relations. Under and by force of that act, they are regarded as forming for some purposes a single artificial person, a legal entity, in whom is vested the title to the social property and funds. In the case of a partnership, the title would be in the joint ownership of all the members of the firm. As a corporation, no individual member, as such, has the right or power to bind his associates or the corporation by a contract, or to represent it in any way, while, as a co-partner, he could bind his associates and the social property by a contract made by him, acting for and on behalf of his associates. As members of a corporation, the liability of each stockholder for the debts of the concern is limited by the law under which the corporation is formed, while, in the case of a co-partnership, every member of the firm is individually liable for all its debts and obligations, subject to this qualification, that the firm assets must be first applied to the payment of the debts. Aside from these and some other distinctions, which need not be mentioned, the relations of the stockholders of a corporation to one another, and their respective interests in the social property and funds, are identical with the relations existing between co-partners and the rights and interests of the members thereof in respect to the property, funds and powers under the contract. *Ditch Co.* v. *Zellerbach*, 99 Am. Dec. 300, 310; *Simpson* v. *Denison*, 10 Hare 51.

Though in the case of a co-partnership, each member of the firm may, by his contract made on behalf of himself and the others, bind his co-partners, the contract which he makes must be within the scope of the partnership business. He is not their representative for all purposes, but only for the purposes of conducting the business for the transaction of which they have united. He is their agent or trustee to that

extent, but no further. His authority, therefore, is to be determined by the contract of co-partnership and the nature of the business in which the firm is engaged. He has no right to sell all of the entire property or assets of the firm, so as to defeat the object of the partnership, nor can he rightfully pay his own individual debts out of the social funds, or in any way divert the property or money of the firm to purposes other than those contemplated by the contract of co-partnership. His powers are limited and defined by the contract. Beyond that, he cannot bind his associates. In the case of a corporation, some of these powers of representation are vested in the board of directors, others can only be exercised by the stockholders or by the board of directors, with the consent of the stockholders. All power and control of the concern is taken from the individual members and vested in either the board of directors or the stockholders, acting as a body, whose power is exercised by the affirmative vote of a majority in interest or such portion as may be designated by the statute. But their powers do not, any more than those of partners, extend beyond the contract which the stockholders have made, acting under the law authorizing them to form a corporation. Power vested in the board of directors is power to execute, as trustees or agents, the corporation contract and manage and control the corporation property. The power vested in the stockholders, acting as a body. is power of the same kind and subject to the same limitation, The stockholders, though having not the legal title, nor any power to act individually so as to bind the corporation, have the equitable title, or a *quasi* equitable title, to the property of the corporation, and the equitable right to have the contract, so made by them under the law, enforced according to its terms, and to have the business of the corporation confined strictly within that which the contract authorizes. In this way, all the principles of law governing the relations subsisting between trustees and their *cestuis que trustent*, the powers and duties of the former, the rights and equities of the latter, and the equitable interests and rights in the trust property, · are operative betweeen the stockholders and the board of directors, and the individual stockholder and the majority of the stockholders acting as a body. They are bound to

respect his property and contract rights in the corporation, if properly called upon, and the equity courts are always open to him for vindication thereof, when the corporate authorities have refused redress, or have determined, against his protest, to violate the contract. 10 Cyc. 969; *Rabe* v. *Dunlap*, 51 N. J. E. 40.

A trustee holds the legal title to the property which constitutes the subject of the trust. He may convey it and pass that title contrary to the terms and limitations of the trust. The purchaser from him will take the legal title to the property, but it will be subject in his hands to the equitable title in the *cestui que trust*. *Atkinson* v. *College*, 54 W. Va. 32, 43; Perry on Trusts, sections 321, 334. But any such abuse of the trust and of the powers of the trustee will be promptly restrained by a court of equity, if, before the accomplishment of the act, *cestui que trust* comes into such court and shows by his bill that the trustee is about to misappropriate the property. The operation of these principles is frequently varied and limited by the conduct of the parties. Estoppel operates as fully and freely against an equitable right as it does against a legal right. If the *cestui que trust* allows an abuse of the powers of the trustee, and the rights of innocent third parties, such as *bona fide* purchasers for value without notice, have attached and become fixed, the negligence, acquiesence or *laches* of the holder of the equitable right may prevent him from having any relief in a court of equity, or may limit and restrict the relief which such a court would have given him, had he been diligent and prompt in the assertion of his rights. It sometime happens, too, that courts of equity will refuse relief at the instance of the trustee, seeking to undo his own act, or to be relieved from the consequences thereof, when it would not refuse to grant relief to the *cestui que trust* himself, if he had presented the complaint on account of the abuse of powers vested in the trustee. These elementary principles are stated here, not by way of contradiction of any position taken by counsel or any member of the Court, but because they are operative in this case and will be referred to in what is to follow.

They are involved in the enforcement of rights under that principle of corporation law by which certain acts are de-

clared to be *ultra vires*, beyond the powers of the corporation. They are such acts as are not within the charter of the corporation, and the charter of the corporation is the contract under which it is organized and does business, and that contract, of course, includes the privileges and franchises extended to them by the law under which they are acting. These privileges are strictly a part of the assets or the property of the corporation, rather than an element in the contract. They constitute the authority to be a corporation, and define and prescribe, to some extent, the rights and powers which may be exercised by the directors, or the stockholders as a body, respecting the control and management of the business, and, in that way, incidentally give power to affect the rights and interests of the stockholders *inter sese.* Every act done by the directors or by a majority of the stockholders, outside of and beyond the charter, is unauthorized, though it might have been proper had the stockholders, by their contract, seen fit to bring it within the scope of the business they agreed to do. It may be such an act as the law would permit the corporation to do, if the corporation contract had been made broad enough to include it, but is *ultra vires* nevertheless, because it is outside of the contract made by the stockholders. Mr. Morawetz, in his valuable work on Corporations, at section 706, after reviewing and analyzing the authorities relating to the doctrine of *ultra vires*, says: "In England as well as in the United States a corporation is not bound by the acts of a majority, except when authorized by the constating instruments of the company. In England as well as in the United States a corporation which has, by the unanimous consent of its shareholders, ratified an act performed by an agent on its behalf, will be chargeable with the act according to the principles of the law of agency, although the agent may have had no authority to bind it." See also Green's Brice's Ultra Vires, pages 33, 34 and 35; Cook, Stock and Stockholders, sections 664, 665; Helliwell, Stock & Stockholders, sections 235, 236.

*Ultra vires* acts, on the part of the board of directors, or of the majority of the stockholders, may be relieved against in equity, at the instance of a stockholder, after he has first made application, in proper manner, to the corporation

itself for redress without avail. If the unauthorized act has been completed, and he is not barred by his acquiescence or *laches*, he may have it undone, or a lien in his favor enforced against the property in the hands of the vendee, if it be . a case in which a property has been wrongfully disposed of. *Nugent* v. *Supervisors*, 10 Wall. 240; *Railroad Co.* v. *Railroad Co.*, 33 Fed. Rep. 440; *Railroad Co.* v. *Bremond*, 35 Tex. 96. If it be a contemplated and threatened act, on the part of the directors or the majority of the stockholders, beyond the power vested in them by the charter, he may prevent it by an injunction. *Hawes* v. *Oakland*, 104 U. S. 450. In that case, Mr. Justice Miller said a stockholder could maintain a suit in equity, when there existed as a foundation of his suit, "Some action or threatened action of the managing board of directors or trustees of the corporation which is beyond the authority conferred on them by their charter or other source of organization.  *  *  * Or where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation, which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity." See also the long list of cases cited at section 406 of Helliwell on Stock and Stockholders. 10 Cyc. 968, 969.

In view of the foregoing principles, it must be apparent that, if the sale of the entire plant and property of the Triple State Company, by a majority of the board of directors, for the sum of one million dollars, payable in the capital stock of the United States Natural Gas Company, at its par value, is an act which is not within the contract existing between the stockholders of the Company, it is an *ultra vires* act, and any stockholder, who has not consented to it, may prevent such sale by injunction. He has an equitable interest in the property of that company and the corporation is, in effect, his trustee, and its officers are its agents, for the purpose of executing that trust, when they are empowered to act for and on its behalf, and, as to such of its powers as are vested in a majority of the stockholders, the stockholders, proposing to act on its behalf, in such instance, are the agents of the trustee, the corporation. Its discretionary powers are somewhat more ample than those of an ordinary trustee, whose

duties are all specifically defined by the instrument under which he has power to act, but its relation to the stockholder is nevertheless, in substance and effect, that of a trustee. It may have wide discretion in the exercise of its powers as such, but it must keep within those powers. The distinction between the exercise of discretionary power, while a person is acting within the scope of his authority, and any act which is entirely beyond the scope of his authority, is a very plain, as well as important, one. In the latter case, there is no authority which denies to the stockholder any of the remedies, for the vindication of his rights, which equity accords to any other *cestui que trust*, when the trustee is attempting to act in excess of the powers conferred upon him. This proposition is not controverted by anybody in this case. Nor is there any difference of opinion, as to whether an act which is beyond and outside of the contract, subsisting between the stockholders, is *ultra vires*, and, therefore, an abuse of the trust, such as a court of equity will restrain. It may be such an act as the law would have permitted the stockholders to include in their contract. It may be a kind of business, for the carrying on of which, it is perfectly lawful to form a corporation. But, if it was not agreed by the stockholders, that the particular kind of business in question, should be carried on, or that the particular act which is threatened should be done, it is beyond the corporate powers. It is none the less *ultra vires*, because they could have included it in their contract as well as not. The question, therefore, is whether the act which is contemplated by the majority of the stockholders of this corporation, and which the plaintiffs seek to prevent, is within the corporation contract existing among the stockholders.

The proposed action involves several different things. One is the sale of the entire property of the corporation, for a price fixed and determined by the corporation, acting through a majority of the stockholders. Another is the acceptance, as consideration therefor, of the capital stock of another corporation, instead of money. The consummation of these two things works an abandonment and discontinuance, on the part of the corporation, of its large and growing business and the cessation of the exercise of the priv-

ileges and franchises conferred upon it by law.    These are to be turned over, so far as they relate to the business which the corporation is now conducting, to another corporation. The Triple State Company hands them over completely to it, ceases to exercise them and sits down as a mere holder of stock in the other corporation.    It is impossible to pass upon the character of this contemplated action, as a whole, without first inquiring into the powers of the corporation, respecting the specific acts which would bring about such results.

Passing, for the time being, the question of the constitutionality of section 83, added to chapter 54 of the Code, by chapter 35 of the Acts of 1901, and assume that it is valid and applies to all corporations, we must determine how the power thereby conferred may be exercised.    For what does it authorize a sale?    What do the terms "sell, transfer or assign" mean?    Do they mean that the corporation, acting through those holding the specified number of shares of its stock, may sell for anything other than money? There is no express authority to do so.    If there is any such authority, it must be an implied authority.    If it can be done, then this statute confers the power to trade and barter away, as well as to sell, the property of the corporation.    What is to be the standard by which the price shall be fixed?    Is the property of the corporation to be measured by the legal standard, the dollar, or is some other property to be first substituted therefor, at a valuation, believed by a portion of the stockholders to be of equal value, and the substituted property measured by said legal standard of value?    On this subject, we are not without authority.    In *Mason* v. *Mining Co.*, 133 U. S. 50, the Supreme Court of the United States quoted with approval the following from Lindley on Partnership: "In the absence of a special agreement to the contrary, the right of each partner on a dissolution is to have the partnership property converted into money by a *sale*, even though a sale may not be necessary to the payment of debts.    This mode of ascertaining the value of the partnership effects is adopted by courts of equity, unless some other course can be followed consistently with the agreement between the partners, and even where the partners have provided that their shares shall be ascer-

tained in some other way, still, if owing to any circumstance
their agreement in this respect can not be carried out or if
their agreement does not extend to the event which has in
fact, arisen, realization of the property by a sale is the only
alternative which a court of equity can adopt." Not only
did that Court approve it, as applicable to the stockholders
in a corporation on dissolution, but it actually applied it in
that case, and denied, to a majority of the stockholders, the
power to sell the property and assets for anything other than
money. The syllabus says: "On the dissolution of a cor-
poration at the expiration of the term of its corporate ex-
istence, each stockholder has the right, as a general rule,
and in the absence of a special agreement to the contrary, to
have the partnership property converted into money,
whether such a sale be necessary for the payment of debts,
or not." An attempt is made to break the force of this de-
cision by the argument that the majority of the stockholders
in that case, or some of them, had exercised bad faith or
fraud in the contract of sale in this, that they had sold the
property at a greatly inadequate price and were themselves
the beneficiaries of the sale, by reason of their owning stock
in the new corporation to which the sale was made. But
that is not the ground of the decision. Not a word or a line
in the opinion imputes to them any fraud or bad faith. The
objection to the transaction which was sustained by the Court
is stated in the opinion, by Mr. Justice Miller, as follows:
"The other objection is that there is no superior right in
two or three men in the old company, who may hold a pre-
ponderance of the stock, to acquire an absolute control of
the whole of it, in the way which may be to their interest, or
which they may think to be for the interest of the whole.
So far as any legal right is concerned, the minority of the
stockholders has as much authority to say to the majority as
the majority has to say to them, 'We have formed a new
company to conduct the business of this old corpor-
ation, and we have fixed the value of the shares of
the old corporation. We propose to take the whole of it
and pay you for your shares at that valuation, unless you
come into the new corporation, taking shares in it in pay-
ment of your shares in the old one.' When the proposition
is thus presented, in the light of an offer made by a

very small minority to a very large majority who object to it, the injustice of the proposition is readily seen, yet we know of no reason or authority why those holding a majority of the stock can place a value upon it at which a dissenting minority must sell or do something else which they think is against their interest, more than a minority can do."

The same principle is asserted by Judges Taft and Hammond of the United States Circuit Court of Appeals, in the case of *Loan & Trust Co.* v. *Toledo &c. Co.*, 54 Fed. Rep. 759, 776, 788. Judge Taft said: "Under the statute of Michigan permitting the sale of an uncompleted railroad by its stockholders to another road, the words of which are quoted in the foregoing opinion, there is no power in two thirds in interest of the stockholders to bind one third to a sale for any consideration but money or money credit.   *   *   * There is no doubt whatever of the proposition argued in the foregoing opinion,—that a minority stockholder is bound by the acts of the majority so long as that majority acts within its charter powers,—nor is there any doubt that neither the majority nor the entire body of stockholders of the corporation can do a corporate act which its charter forbids; but there are corporate acts which are not within the charter power of the majority of the stockholders, and yet which are not beyond the power of the corporation.   They are acts of the corporation, which the state, as the grantor of the corporate franchise, has no interest to invalidate, provided all the stockholders consent thereto.   They are acts which, if done by a majority only, infringe upon the charter rights of the minority.   In this case the power to sell for money was conferred by statute upon two thirds of the stockholders of the uncompleted road.   The sale could not be for stock in another company, against the objection of the minority stockholders.   No such power was vested by the statute in the two thirds majority." Judge Hammond said: "I do not think any corporation can go out of business, and sell its properties and franchises in entirety, (outside of sales made in the ordinary course of business,) and bind a minority of the stockholders, by the will of the majority, to such a sale, upon any principle of the public welfare or like consideration; certainly, not to compel the minoriry, on such a sale,

to take chips and whetstones for their shares of stock,—that is to say, anything else than money. Moreover, I doubt seriously the power of the state, by legislation, to compel the minority to so surrender their property. I do not deny that the majority of the stockholders, in order to preserve for themselves and the minority the advantage of a sale *en bloc*, rather than a resort to a winding up and accounting among each other for their respective shares of the corporate property, and to prevent the destruction of the corporate franchises by a winding-up, might, under some conditions have, in a court of equity, the right to compel the dissentients to an ascertainment of the value of their shares in some other way than by a sale for distribution, and that ordinarily the market value of the shares might be resorted to as a measure of that value, and that upon such ascertainment the court might compel the dissentients to surrender their shares upon the payment, in legal-tender money of this value; and, what the court could compel, the stockholders, without compulsion, could do by agreement *inter sese*. But this power could not be enlarged into any compulsion of assent to a scheme of alienation of the corporate property which left the minority nothing but stocks in new enterprises, or other modes of compensation, for their shares in the corporate property."

Rather conceding that the word "sell," used in the statute does not include any power to barter, counsel for the appellees insist that the words "transfer or assign," used in connection therewith, afford latitude for such power by implication; the argument being that although a transfer or an assignment, as well as a sale must be upon a consideration, the consideration need not be a price in money. They say each term was intended to be a separate grant of power, designed to embrace every form of contract by which property can be passed from one owner to another. Nothing in the context indicates any intention to give any of these terms any meaning other than that which they have by law. They are modes of alienation, disposition of property and rights. "Sell" usually applies to tangible property. It is a technical term applicable to the alienation of that kind of property and especially to personal property. "Transfer or assign" are applicable to choses in action, rights and privileges,

rather than tangible property, and are almost, if not quite, identical in meaning. When a man has disposed of a promissory note, he is said to have assigned it. When, having held a right of some sort of an incorporeal nature, he has disposed of it, he is said to have transferred it. None of these terms, except the word "sell," indicate what the nature of the consideration shall be. Neither assign nor transfer is broad enough in signification to cover the consideration. They, in no sense, define the contract under which they pass title. They simply define the nature of the act by which the title passes. A transfer or assignment may be made in pursuance of a gift as well as of a sale. They are more limited than the word " sell," which necessarily involves a price or consideration. They stop short of indicating whether the property may be disposed of by sale or barter. They are silent on that subject. How, then, can they be said to confer a power to trade? Are we to say, as matter of conjecture, that the legislature intended, by using these words, to empower a majorify of the stockholders to give away the assets of the corporation? We might do that, with as much authority, as we have, in the silence of these two words, as to the nature of the contract, for saying it intended to authorize a trade of the assets for other property. Plainly, the only purpose, in using the three terms, was a desire to express the legislative will in terms, deemed by the legislature to be technically applicable to all the several species of property a corporation might have to dispose of. That a power to sell does not authorize a sale for anything but money is elementary law. *State* v. *Chitton*, 49 W. Va. 453; Clark & Skyles Agency, section 581.

The principal argument in favor of the power claimed, however, is that the legislature, while giving the power of sale by section 83 of chapter 54 of the Code, vested in the corporation the power to purchase, with the consent of a majority of the stockholders, stock in other corporations. For this latter proposition, section 3 of chapter 52 of the Code, as amended by chapter 35 of the Acts of 1901, which, as so amended, has been hereinbefore quoted, is relied upon. I submit here the following reasons for grave doubt, on my part, that said section confers any such power: Said

section does not, by any affirmative language, confer any authority or power upon one corporation to purchase the stock or bonds of another. It is a negative, and not an affirmative, provision, but there is an exception in it. As it stood in chapter 52, before amendment, it said that, unless specially authorized, no corporation should subscribe for or purchase the stock, bonds or securities of any joint stock company. It is urged here that the legislature must have intended something by the change, and that, therefore, it must have intended to confer an unlimited and unrestricted power upon corporations to subscribe for and purchase the stock of one another. The rules of construction, applicable in such case, do not, in my opinion, permit indulgence in any such wild conjecture as to what the legislature intended. We are told that, because it is difficult or impossible to see just what the intention was, we must say the legislature intended to do everything it could have done on that subject. It seems to me, the rule of construction would be the exact reverse. The court ought to look for some limited purpose, which the legislature might have contemplated, and restrain the operation of its language to that purpose. The bestowal of power upon corporations to hold stock in each other is a grant of power against the public, as are nearly all corporate privileges. The grant of such a power must be express. So says the great weight of authority. *Marbury* v. *Land Co.*, 62 Fed. Rep. 335; *Davis* v. *Railroad Co.*, 131 Mass. 258; *Colman* v. *Railroad Co.*, 10 Beav. 1; *Holt* v. *Bank*, 25 Fed. Rep. 812. The rule of construction, in determining whether there is an express grant, is that every doubt shall be resolved in favor of the public and against the corporation. 1 Thomp. Corp. sections 324, 325; *Black* v. *Canal Co.*, 24 N. J. E. 456. Certainly the court ought not to resort to such an assumption or conjecture as is set up here, if, independently of said section, there was power by express grant in some corporations to purchase stock in others. If there are any such corporations, then the purpose of the legislature is made plain. Section 3 assumes that some of the corporations may purchase stock in others, it is true. The section is a negative proposition, pregnant with an affirmative which it includes by way of assumption. It assumes that some corporations have the power to purchase stock in others and

prescribes the manner in which it shall be done and that is all. Courts have no power to add to that, under any rule of construction of which I have any knowledge, or which I have been able to find. Now, there are corporations which have such right and power, but that does not signify that all corporations have it. What those corporations were, the legislature knew; for statutes previously passed by the legislature itself, then in existence and allowed to remain unrepealed, show what they are. Section 3 of chapter 53 says "any corporation may take real estate, stocks, bonds and securities, in payment, in whole or in part for any debt *bona fide* owing to it, or as a security therefor, or may purchase the same if deemed necessary, to secure or obtain payment of any such debt, in whole or in part, and may manage, use and dispose of what has been so taken or purchased, as a natural person might do. * * * * And any manufacturing company may with the assent of the holders of two-thirds of its stock, had by a vote at a stockholders's meeting, subscribe for or purchase the stocks, bonds or securities of any corporation formed for the purpose of manufacturing or producing any articles or material used in the business of such joint stock company, or dealing in any articles or material manufactured or produced by such joint stock company, or constructing a railroad or other work of internal improvement, through or into the county in which the principal place of business of such joint stock company may be." Section 82*a* of chapter 54 further provides that "Any railroad company, with the assent of the holders of two-thirds of its stock, had by a vote at a stockholders' meeting, become surety for, or guarantee the bonds, stock or debt of any railroad company, or in any other manner, aid such railroad company in the construction of its railroad, or other works of improvements, and with like consent may lease its road to any other railroad corporation within this State." Then followed a clause prohibiting consolidation of railroads with parallel or competing lines by way of exception to the operation of the foregoing. How far section 3 of chapter 52, as amended, effects, by way of modification, the two sections just quoted from, it is not necessary to inquire. Whether a board of directors, in exercising the common law power of taking the stock of another corporation in sat-

isfaction of a debt, declared by section 3 of chapter 53, must
have the assent of a majority of the stockholders, does not
arise here; nor are we called upon to say whether the re-
quirement of a two-thirds vote, found in said section 3 and
section 82*a* of chapter 54, has been replaced by the require-
ment of a mere majority.    It suffices for the purpose of
this inquiry to say that the implication which is said to arise
from the negative language of section 3 of chapter 52, by
reason of the exception therein contained, is fully answered
by these two provisions.    Said section 3 does not say by
what vote, whether a majority or two-thirds, the consent of
the stockholders shall be given, but it is imperative that
the assent of the stockholders shall be first had.    As the sec-
tion stood before amendment, it was unintelligible.    Nobody
could tell what it meant.    It was constitutional, rather than
legislative, language.    What was meant by the phrase "un-
less specially authorized?"    Who was empowered to
authorized specially or otherwise?    If the legislature had au-
thorized anything specially of course it was in effect, and, if
it had not authorized any of the things named in said sec-
tion, there was no power to do them.    In order to give them
some effect, the court might have said, by way of construction,
they prescribe how any corporation having such power shall
exercise it, namely, by consent of the stockholders.    In any
other view the words were meaningless. Striking out those
meaningless words left the common law in force.    The enact-
ment of the new phrase prescribed a mode of executing ex-
isting powers; and it will not logically or legally bear any
other inference.

But, if it be conceded, that said section 3 of chapter 52
confers, upon one corporation, power to subscribe for or
purchase stock of another, it does not follow that, in the
case of a given corporation, the purchase of stock by the di-
rectors, with the assent of a majority of the stockholders,
would be *intra vires.*    To give an act of the corporation
such a status, it must be, not only within the powers al-
lowed, by general law, to such corporations as may have
seen fit to provide, by contract of the stockholders in organ-
izing it, for the exercise thereof, but also within the con-
tract made by the stockholders in the organization of the
corporation.    It takes two things to make an act *intra vires:*

The law must authorize it; the corporators must have agreed to perform it. There never was any agreement among the stockholders of this corporation to purchase the stock of any other corporation. It is not pretended that there ever was. Nor is there any pretense that, if, at the time this corporation was organized, the stockholders had agreed to exercise such power, the agreement would have been lawful. I intimate no opinion as to whether it would or not, it being unnecessary to do so. Moreover, if they could have done so, or, if not having done so, the subsequent passage of this law, making it lawful for every corporation to do such an act, may be deemed now to have entered into the contract, without an acceptance by the stockholders, it does not follow, that the primary object of the creation of this corporation may be defeated and destroyed by the exercise of that power. At the date of the organization of this corporation, the purchase and holding of stock was no element of its contract. A majority of the stockholders now attempt, not only to put it in to the contract, but also to so use that power as to produce cessation of the other corporate powers and privileges, divert all the property of the corporation to the uses and purposes of a new and different corporation, curb and stifle the vigor, activity and energy of the corporation, transfer the equitable interests of the stockholders into the hands of persons operating under a new and different contract, and convert the corporation into a mere shell, without any property or assets within its own power and control. If this new element can be said to have entered into the contract, must it not be restrained to a subordinate, auxiliary position and function? Shall the majority be allowed to make the "tail wag the dog," by completely demolishing the business of the corporation and putting it out of existence, for all practical purposes, through the exercise of this newly conferred power? Under the head of "General Powers of Corporations," section 2 of chapter 52 of the Code, says: "The powers mentioned in the preceding section, or otherwise granted to any corporation, shall be limited by the purposes for which it is incorporated, and no corporation shall engage in transactions or business not proper for those purposes; nor shall corporate powers be exercised in violation of any law of the State."

The object and purpose of this corporation, as shown by its charter, or agreement of its corporators, is that "of acquiring, owning, leasing, holding, developing, operating and disposing of lands, and interests in lands, containing or supposed to contain, oil or natural gas, or both, and of acquiring, owning and operating all such pipe lines, and other instrumentalities as may be necessary and desirable, or either, in the production, transportation, consumption, sale and delivery of oil or natural gas, or both, and of doing all other lawful acts necessary or believed to be necessary or of use or believed to be of use in carrying out the objects of the said proposed company, and of the business which may be connected therewith in the production, transportation, sale and delivery of oil and natural gas, or either one hereof." The authorities are uniform to the effect that a majority of a corporation cannot so amend its charter, without the consent of the minority, as to work a fundamental change in the contract. They have no power to carry the corporation into a new and different business. Nor has the legislature itself, under its reservation of power to repeal, alter and amend, unlimited authority. It is no answer to this to say the corporation has the power to sell all of its property and assets and discontinue its business; for, on such dissolution, the stockholder is entitled to take out of the assets of the corporation an amount of property or money commensurate with his interest in its stock. The contention is that, because the legislature has, since the formation of this corporation, declared that it shall be lawful for a corporation, with the assent of a majority of its stockholders, to purchase the stock of another corporation, this subsequent law has entered into, and become a part of, their contract, or that it is within the power of a majority of the corporators, to write into their contract, against the will of the minority, an agreement to do a thing which the minority never had agreed to do. In other words, that the legislature has forced upon these minority stockholders the duty of exercising a power and right which they never wanted to exercise and are unwilling to exercise, or has vested in the majority the right and power to compel them to exercise a corporate privilege and power which they never asked for, never agreed to exercise and are unwilling to exercise. The untenableness of

this proposition and its utter want of foundation in legal and equitable principles will be best shown by illustrations of its operation.  Two men are engaged as partners in the milling business.  One is entrusted with the management of that business.  They, might, if they had seen fit to do so, have engaged in the mining business.  The law permitted them to do it.  Their contract was made and their business conducted under the general law of the State, and that law entered into their contract and business and was a part of it. Now the manager says, because it is lawful for me and my associate to do a mining business instead of a milling business, I will sell out this mill and buy a coal mine and operate it. What would be the result, if his associate, having been apprised of his intention to do that, should apply to a court of equity for an injunction?  No court in the world would hesitate for one moment in granting an injunction in such a case as that.  Suppose five men should engage in the mercantile business as a corporation, duly organized for that purpose. They might have incorporated for the purpose of doing a milling business, but did not.  The law permitted them to do either, but they saw fit to incorporate for the purpose of carrying on a mercantile business.  A majority, in a meeting regularly convened, passes a resolution providing for the sale of all their merchandise and the purchase, with its proceeds, of a mill, with all of its machinery and appliances, stock of wheat and flour and the good will of the business. Would any court hesitate for one moment to grant, to the minority stockholders, an injunction to prevent the consummation of such a transaction, in violation of the contract, but within the range of the powers allowed a corporation nevertheless?  What difference does it make that, after a corporation has been formed, the legislature has, by statute, said it shall be lawful for a corporation to do things which they could not have lawfully done before that time.  On what principle can that be made a part of the contract, the corporators not having agreed to it?  The legislature has not said they shall exercise such power and whether it might lawfully do so, in such case as this, does not arise.  The thing authorized by subsequent law becomes a part of the contract, if the stockholders see fit to make it so.  Whether they do so or not, is a matter of no concern to the State.  It

is a privilege extended, not a burden or duty imposed. The new law places, the newly created privilege within reach of the corporation, but that does not bring it within the contract of the corporators. It does not become a part of their contract until they accept it.

There is a limited power in the majority to alter the contract by amendment of the agreement. The legislature has conferred this power by section 10*a* of chapter 54 of the Code which says "Any corporation, except railroad companies, may agree to and adopt a new agreement, so as to enlarge or diminish the objects and purposes for which it was incorporated, by signing and acknowledging a new agreement, in all respects as the original agreement was signed and acknowledged. Such new agreement must be signed and acknowledged by the holders of a majority of the stock of the corporation." But this power is a limited one. It does not extend to the substitution of entirely new objects and purposes for those originally inserted in the contract. It is only a power to enlarge or diminish the objects and purposes existing, at the time of amendment, as originally agreed upon. There are many decisions which say that it is competent for the legislature to make limited alterations in the charter without the consent of the stockholders and to permit a majority of the stockholders to bind the minority in. that respect. *Nugent* v. *Supervisors*, 19 Wall. 241; *Bishop* v. *Brainerd*, 28 Conn. 299; *Plankroad Co.* v. *Thatcher*, 1 Kernan 102; *Railroad Co.* v. *Dudley*, 4 Kernan 336; *Meadow Dam* v. *Gray*, 30 Me. 547; *Railroad Co.* v. *Winchester*, 13 Allen 32; *Noyes* v. *Spaulding*, 27 Vt. 420; *Railroad Co.* v. *Renshaw*, 18 Mo. 210; *Fry* v. *Lexington*, 2 Metc. 314; *Railroad Co.* v. *Beers*, 27 Ill. 189; *Railroad Co.* v. *Earp*, 21 Ill. 292. To the same effect see the long list of cases cited in the note in Green's Brice's Ultra Vires, at pages 96 to 99, inclusive. There, it is shown that the cases are far from unanimous even on that proposition, when the legislative act is merely permissive and not mandatory. See also Cook on Stock and Stockholders, section 501, and the numerous cases cited there.

Helliwell on Stock and Stockholders, at section 268, says: "Nor, under a reservation of power to amend, is the legislature authorized to change the object of the corporation,

nor to require another in its place,—that would be substitution, not modification, and hence cannot be enforced upon the stockholders.   *   *   *   A reservation of power to amend or repeal does not confer upon the legislature power to divest property rights which have become vested.   Except as the legislature may control a corporation by control of its franchise, it enjoys the same rights with respect to property as a natural person."   Cook on Stock and Stockholders, at section 501, says:   "The power to make amendments and to repeal and alter charters has been reserved in most of the states of the Union.   It is clearly established that the legislature cannot, under this reserved power, amend the charter so as to change the whole character of the enterprise and compel the corporation to proceed under the amended charter.   The restrictions of the state constitution still exist, and individuals cannot be forced by the state into new contracts.   An amendment under the reserved power cannot change the character of the enterprise, nor take away rights already acquired under the charter.   It must not be foreign to the purposes of the original charter.   It may, however, go to any extent in authorizing the corporation itself, by a unanimous vote of the stockholders, to make fundamental changes.   The latest and best view taken of this reserved power of the state is that under it a fundamental amendment to the charter does not authorize a majority of the stockholders to accept the amendment and proceed, but that unanimous consent of the stockholders is necessary."   In *Clearwater* v. *Meredith*, 1 Wall. 25, 40, 41, the court said:   "When any person takes stock in a railroad corporation, he has entered into a contract with the company, that his interests shall be subject to the direction and control of the proper authorities of the corporation to accomplish the object for which the company was organized.   He does not agree that the improvement to which he subscribed should be changed in its purposes and character, at the will and pleasure of a majority of the stockholders, so that new responsibilities, and it may be, new hazards, are added to the original undertaking.   He may be very willing to embark in one enterprise, and unwilling to engage in another; to assist in building a short line railway, and averse to risking his money in one having a longer line of transit. But it is not every unimportant change which would work a

dissolution of the contract. It must be such a change that a new and different business is superadded to the original undertaking. The act of the legislature of Indiana allowing railroad corporations to merge and consolidate their stock, was an enabling act—was permissive, not mandatory. It simply gave the consent of the legislature to whatever could lawfully be done, and which without that consent could not be done at all. By virtue of this act, the consolidations in the plea stated were made. Clearwater, *before* the consolidation, was a stockholder in one corporation, created for a given purpose; after it he was a stockholder in another and different corporation, with other privileges, powers, franchises, and stockholders. The effect of the consolidation 'was a dissolution of the three corporations, and at the same instant, the creation of a new corporation, with property, liabilities, and stockholders, derived from those passing out of existence;' McMahan Morrison (16 Ind. 172). And the act of consolidation was not void because the State assented to it, but a non-consenting stockholder was discharged. Clearwater could have prevented this consolidation had he chosen to do so; instead of that he gave his assent to it and merged his own stock in the new adventure. If a majority of the stockholders of the corporation of which he was a member had undertaken to transfer his interest against his wish, they would have been enjoined. (*Lauman* v. *Railroad Co.*, 30 Pa. St. 46.) There was no power to force him to join the new corporation, and to receive stock in it on the surrender of his stock in the old company."

It is true that, in that case, there was no reservation of power to alter the act under which the railroad company was incorporated, but it is not perceived that that would have made any difference if it had been; for the court said, in addition to what has been quoted: "The power of the legislature to confer such authority cannot be questioned, and without the authority, railroad corporations organized separately, could not merge and consolidate their interests. But in conferring the authority, the legislature never intended to compel a dissenting stockholder to transfer his interest, because a majority of the stockholders consented to the consolidation." To the effect that, where the legislature has reserved the power to alter and amend, and has passed an act which merely

enables the stockholders to extend their business, if they see fit to do so, a majority cannot bind the minority to make such an extension, if it amounts to an abandonment of the old business and the commencement of a new one, or involves the impairment of property rights of the stockholders, and is therefore fundamental in its nature, see the following cases: *Railroad Co.* v. *Dudley,* 14 N. Y. 336; *Mowery* v. *Railroad Co.,* 4 Biss. 78; *Sage* v. *Dillard,* 15 B. Mon. 353; *White* v. *Railroad Co.,* 14 Barb. 560. *Sprigg* v. *Telegraph Co.,* 46 Md. 67; *Boone* v. *Railroad Co.,* 10 Ind. 93; *Railroad Co.* v. *Marsh,* 17 Wis. 13; *Railroad Co.* v. *Preston,* 35 Ia. 115.

To show that the principle of these decisions is sound, in constitutional, as well as in common, law, reference may be had to those instances in which states have seen fit to repeal and alter charters under which property rights had vested in the corporations and their stockholders. The decisions unanimously hold that no legislature, in the exercise of reserved power, can destroy vested rights in property other than rights in the franchise itself, by repealing the charter of a corporation. In *Greenwood* v. *Freight Co.,* 105 U. S. 13, 19, the Court said: "Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such a repeal; and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of such a corporation, to their interest in its property, are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights." As an indication of the extent to which the reserved power of repeal and alteration may be exercised against the will of the corporation, and its stockholders, that court further said in the same case: "If the essence of the grant of the charter be to operate a railroad, and to use the streets of the city for that purpose, it can no longer so use the streets of the city, and no longer exercise the franchise of running a railroad in the city. In short, whatever power is dependent solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the state, is abrogated by the repeal of the law which granted

these special rights." The power of the state to alter or amend cannot, in the nature of things, extend beyond the thing which the state has granted. It never granted the contract. It had nothing to do with the contract between the stockholders, except to extend to them the privilege of forming it. What it never granted it has no power to destroy. It may take away the privilege of continuing that contract, but it never granted a dollar of the property that has been accumulated in the exercise of the privilege, and has no more power to take away and convert to its own use, without compensation, or bestow upon any other private person, with or without compensation, any of that property, than it has to take the property of any private person accumulated or acquired in the transaction of any other lawful business. That property, whatever its character or amount, is the product of the industry, energy, business sagacity and capital of the corporation, and, therefore, as sacred as any other private property. As the state has no right to do so, for its own or public purposes, its lack of power to confer upon an individual the authority to take it away indirectly, by the destruction of that business and forcing the corporator into an entirely new enterprise, is more apparent. It may repeal that charter, and thereby discontinue the business, but it clearly has no power to authorize a majority to compel a dissenting stockholder to allow the property of a corporation, in so far as it belongs to him to be diverted, as his property, into an entirely new and different business. No decision of any court in America, so far as I have been able to ascertain, admits any such legislative power.

The Supreme Court of the United States, in *Shields* v. *Ohio*, 95 U. S. 319, a case arising under the reserved power of repeal and alteration, said: "Where an act of incorporation is repealed, few questions of difficulty can arise. Equity takes charge of all the property and effects which survive the dissolution, and administers them as a trust fund, primarily for the benefit of the creditors. If anything is left, it goes to the stockholders. Even the executory contracts of the defunct corporation are not extinguished. The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be made in good faith, and be consistent with the scope and object of the act of incorpora-

tion. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration. Beyond the sphere of the reserved powers, the vested rights of property of corporations, in such cases, are surrounded by the same sanctions and are as inviolable as in other cases." Justice Swayne then cited, in the opinion, *Miller* v. *Railroad Co.*, 21 Barb. 512, in which an act of the legislature, imposing a burden upon the railroad company, which was expensive and of no benefit to the company, was held to be void. This was not a mere permissive law. It was a mandatory act of the legislature requiring the thing to be done, and it was passed under the belief that it was within the power, reserved by the statutes of the state, to make alterations and amendments in the charters of corporations. It was an act, requiring a railroad company to build an expensive crossing over a highway. Though that was an act beneficial to the public generally, it was in no sense beneficial to the railroad company. It was not an act in furtherance of the business of the company, but wholly foreign to its business.

The foregoing principles harmonize fully, not only with the theory of this opinion, but with the following decisions and expressions of judicial opinion: In *White* v. *Railroad Co.*, 14 Barb. 559, Edwards, J., speaking for the New York Court, said: "A charter of incorporation, like a contract between individuals, is to be construed according to its spirit and meaning, as well as its letter. And in this point of view, when it is asked by the plaintiff's counsel whether the legislature can convert the defendant into a banking, insurance or mining company, I answer, most unhesitatingly, that it cannot; and for the obvious reason that such an act would create a new company, of a new and distinct character." In *Railroad* v. *Preston*, 35 Ia. 115, 125, the court said: "If, under this charter, the corporation should undertake the construction of a lateral branch largely increasing the cost of the enterprise, and bearing an undue proportion to the original undertaking, they might be enjoined from so doing at the suit of a stockholder. And if such design should be accomplished, a stockholder might be released from liability." *Booe* v. *Railroad Co.*, 10 Ind. 93, holds that: "Where two or more railroad companies, with the consent of the legislature, granted subsequently to the subscriptions of stock, but without the

consent of the stockholders, consolidate their separate existence into one, non-consenting stockholders are released, and may withdraw from the corporation." In *Sprigg* v. *Telegraph Co.*, 46 Md. 67, 78, the court, in view of results stated by it as follows, held that the alteration of the contract was not fundamental: "On the contrary, the number of shares of the capital stock, the property, business, objects and purposes of the company remain the same, and under the new charter each stockholder of the old company will be entitled to an equal number of shares in the new, and of the same par value." In response to the objection that additional powers were conferred, the court held them to be merely auxiliary to the original design. *Railroad Co.* v. *Marsh*, 17 Wis. 13, holds as follows: "A radical, fundamental change in the character of the enterprise in which a railroad company was engaged when it obtained a subscription to its stock, releases the subscriber from his liability. The fact that such change is made under a grant of power by amendment to the charter, in a state where the legislature is empowered to alter or repeal acts of incorporation at pleasure, does not affect the application of this rule." In *Mowery* v. *Railroad Co.*, 4 Biss. (U. S.) 78, the court held as follows: "To effect a consolidation of railroad companies subsisting under special charters not providing therefor, the consent of every stockholder must be given; and any one dissenting stockholder is entitled to an injunction against such consolidation." There was a general statute of the state in addition to the special charters, authorizing consolidation, and there was a reservation of power, to alter and amend, in the special act of incorporation. The court held the general statute, merely enabling railroad companies to consolidate, but not requiring them to do so, to be a mere privilege which the stockholders might claim if they saw fit to do so. The opinion then proceeds as follows: "Now the acceptance of this offered privilege would involve a fundamental change in the charter of the company accepting it,—a change which, if the doctrine already stated be true, could not be effected in the case of a corporation subsisting under a special charter, but by the consent of every stockholder. So far as appears, no such consent has ever been given by all the stockholders, or even by a majority of

the stockholders, of the Indianapolis and Cincinnati Railroad Company. I conclude, therefore, that the general law of 1853, permitting railroad companies, at their pleasure, to consolidate, has never become part and parcel of the charter of the company in question, either by legislative amendment or otherwise."

Every decision, relied upon in the argument for the appellees, adheres to these general principles. Not one of them ignores the element of contract in the charter of a corporation, and not one of them ignores the principle that an act done or attempted which is outside of the contract is *ultra vires*, and, therefore, not binding upon a dissenting stockholder, unless he has, in some way, consented to it, either expressly or by conduct which estops him. In *Traer* v. *Lucas Prospecting Co.*. 99 N. W. 290, decided by the Iowa court, in which the sale by a corporation of all its property in exchange for the stock of another company was held to be a valid transaction, the opinion expressly states that the business of that corporation, according to the express terms of its contract, was the purchase and sale of mineral lands. It was organized for the purpose, not of mining, but of merely dealing in mineral lands in connection with which prospecting was contemplated. The court said: "The dominant thought, as it seems to us, was to secure control of such lands, either by purchase or otherwise, for the purpose of sale or lease to some individual or association desiring either to speculate further with such rights, or to actually mine the properties; otherwise no benefit could be derived from the benefit of the corporation. These provisions would alone indicate that it was the intent and purpose to sell any or all of these property rights whenever it might be to the advantage of the corporation to do so." The court held this to be the contract, not merely something which the law authorized the parties to agree to do. Then proceeding, with reference to the right to take stock in another corporation, the court said: "But the articles of incorportion expressly gave the Lucas Company the right to purchase, sell and deal in the corporate stocks of corporations authorized to conduct mining operations." Both transactions, necessary to effect the thing done, were within the law and within the written specific contract of the stock-

holders of the corporation as well. This is the strong case relied upon. Another of the cases is *Coler* v. *Tacoma Railway Co.*, 64 N. J. E. 117. The railway company sold its entire road to another company and took in payment thereof stock in the other company. But its charter, its contract between the stockholders, declared one of its objects to be "to acquire, build, construct, own and operate outside of the state of New Jersey railway properties of all kinds and descriptions and with any kind of motive power, and to sell and lease the same." Here was a specific, positive agreement among the corporators for the sale of such properties as it might acquire. More than that, the by-laws provided that, "with the consent, in writing, and pursuant to a vote of the holders of a majority of the stock, issued and outstanding, and not otherwise, the stockholders having been formally convened in a meeting, the directors shall have power to sell, assign, transfer, mortgage or otherwise dispose of, the whole property of the corporation." Another of the objects of the corporation, set forth in the agreement, was "to acquire, by purchase or otherwise, the stocks, bonds and other evidences of indebtedness of persons, firms and other corporations, and to sell, mortgage, pledge or otherwise dispose of such stocks, bonds or other evidence of indebtedness." Here, as in the Iowa case, the contract expressly provided for everything that was done, These two decisions are no authority, therefore, for the position that an act of this kind can be done by a corporation whose stockholders never agreed to the steps necessary to the consummation of the thing, or to exercise the powers which are requisite to its consummation. Another case is that of *Metcalf* v. *American School Furniture Co.*, 122 Fed. Rep. 115. There, the entire property of a corporation, organized under the laws of West Virginia, was sold to another corporation and the stock of the corporation taken in payment. But that decision is no authority for the position taken here, even if it be sound. The corporation was a failing one. It had been demonstrated that the purpose for which it was organized could not be accomplished. Dissolution was necessary, and the power to dissolve a corporation, when necessity therefor exists, is always within the contract. It is an element in every corporation contract. This conferred

a right to sell. Besides the statute, under which the corporation was organized, conferred the absolute right to dissolve it at any time. Having thus reached the conclusion that a majority of the stockholders had the lawful right to sell the property of the corporation, the court proceeded to inquire as to their power to accept stock of another corporation, and in that connection, said: "It is asserted that the implied power to wind up the affairs of a corporation and dispose of its property authorizes a sale for stock in another corporation. Abundant authority is found to fortify this claim," and, for that position, *McCutcheon* v. *Merz. Capsule Co.*, 71 Fed. Rep. 787, *Holmes* v. *Holmes*, 137 N. Y. 252, *Miner's Ditch Co.* v. *Zellerbach*, 37 Cal. 543, 99 Am. Dec. 30, and *Thomas* v. *Railroad Co.*, 101 U. S. 71, were cited. To the same class of cases belongs *Treadwell* v. *Manufacturing Co.*, 7 Gray 393. These propound the doctrine that the power of dissolution, which every corporation possesses, is within the contract as well as within the law. In executing that power, the majority of the stockholders act as trustees, and as such, may be said to have at least as much discretionary power, as all other trustees have. After a trustee has executed the power vested in him, in a manner somewhat variant from the strict terms of the instrument under which he acts, because of circumstances rendering it, in his opinion, necessary and benficial to the *cestui que trust*, to make the departure, and it appears from the circumstances that there were good reasons for the course pursued, owing to his inability to comply strictly with the powers conferred, a court of equity will not disturb it. The books afford numerous illustrations of this. Administrators and executors, laboring under difficulties, growing out of peculiar circumstances which make it necessary for them to deviate to some extent from the course that would be pursued under ordinary circumstances, are not liable, even though loss should result, if it appears that they have acted prudently and diligently under all the circumstances. Upon this principle, the case of *Metcalf* v. *Furniture Co.* was disposed of. Whether it is sustained by the decisions relied upon is an inquiry which need not be conducted here. In *Holmes* v. *Holmes*, 127 N. Y. 252, the plant of the corporation was sold to another corporatinn in consideration of

stock in the other corporation, with the consent of all the stockholders, wherefore that decision is wholly inapplicable. It is no authority for the proposition. *Thomas* v. *Railroad Co.*, 101 U. S. 71, seems to have no application whatever to this question. It was evidently taken from the opinion in the Merz Capsule case, where it is cited for another proposition, by inadvertence. *Miner's Ditch Co.* v. *Zellerbach* was this kind of a case. The ditch corporation was formed for irrigating purposes in California. In the same vicinity, there was another company of the same kind, engaged in the same business. Some of the persons interested held stock in both companies. They consolidated their holdings by conveying all their property to a third and new corporation. This corporation executed a mortgage to Zellerbach and Powers on all the property, in 1862, and there was no objection made by any stockholder. The mortgage provided that the mortgagees might apply the profits and income of the property to the payment of the debt, and, in 1863, they were put in possession of the property. The new corporation expended large sums of money in addition to the $200,000.00 borrowed on the mortgage, and the Miner's Ditch Co., one of the original corporations, from 1860 to 1865, did not pretend to do any business or to set up any claim to, or control of, the property. After this long acquiescence in the transaction, the Miner's Ditch Co. itself brought a suit to set aside that transaction. It asked a court of of equity, after that long acquiescence and delay, to relieve it from its own act. No stockholder complained, and it is not at all surprising that the court refused to grant any relief. It was estopped by its own act, by its acquiescence and by its *laches*. In the case of *McCutcheon* v. *Merz Capsule Co.*, 71 Fed. Rep. 787, the court did not indicate under what circumstrnces it would sustain a sale of the entire property of a corporation for stock in another company. It simply adverted to the principle. It did not sustain the transaction in that case. The Merz Capsule company had sold its entire plant to another corporation, taking stock in payment, not with the view to dissolution, but with the intention of still maintaining its corporate existence and holding the stock in the new corporation. The court said that as it was not an act of dissolution, and

as the intent disclosed on the face of the transaction, was not
to dissolve the corporation, but merely to take the status
of a stockholder in another corporation, the whole transac-
tion was *ultra vires*, and not within the powers of the cor-
poration.    Judge Lurton said: "That the facts of this
case do not bring it within any well-recognized exception to
the general rule inhibiting such investments is to use a most
obvious proposition.    By the agreement of November 29,
1893, which we are asked to sanction and specifically en-
force, the Merz Capsule Company contracted, not only to
sell its entire manufacturing plant, including patents, pro-
cesses, and good will, to the new corporation, when or-
ganized, but that it would never again engage in the same
business.    If its purpose had been in good faith to wind up
its affairs, and distribute the price to be paid among its
stockholders, or to convert the same into money for pur-
poses of distribution, the transaction might be supported
under the authorities heretofore cited, although payment
was to be received in the stock and bonds of the new com-
pany."    In other words, he intimated by this language that,
as an incident to the exercise of dissolution which was an
*intra vires* power, the circumstances might have been such
as to justify the taking of stock in payment, but whether
they were or not, he did not inquire for it was unneces-
sary, and what they were we do not know.    The case in
Gray (Mass.) 393; *Treadwell* v. *Manufacturing Co.*, ought
not to be considered authority upon this proposition for the
actual disposition of the case turned upon another question.
The judge simply expressed the opinion that the power to
dissolve a failing corporation carried with it incidentally the
power to take stock in another corporation in payment of
the property.    But he did not analyze the proposition at all.
He said simply this: "Nor can we see anything in the pro-
posed sale to a new corporation, and the receipt of their
stock in payment, which makes the transaction illegal.    It
is not a sale by a trustee to himself, for his own benefit; but
it is a sale to another corporation for the benefit and with
the consent of the *cestui que trust*, the old stockholders."
Why, as a matter of fact, one of the stockholders was then
before the court asking to be permitted to protest against
the sale, but was denied that right because his bill was

not ·properly framed. He had not consented. He had come into the court as a trustee holding stock, asking for instruction and advice from the court as to whether he should agree to the sale. It is nothing but a mere dictum, merely a side remark by an able judge, without having made full and careful investigation of the subject. He probably meant it could be done if all stockholders assented.

These decisions are entitled to but little weight as against the solemn well-considered decision of the Supreme Court of the United States in *Mason* v. *Pewabic Mining Co.*, 133 U. S. 50, and the carefully prepared opinions of Judges Taft and Hammond in *Loan & Trust Co.* v. *Toledo &c Co.*, 54 Fed. Rep. 759. It is urged, however, that these two cases ought not to be controlling here, because it appears that in the latter, there was no power in the selling corporation to hold stock in another corporation. The statute of Michigan, under which that case arose, did not give one corporation the power to hold stock in any other. I do not understand either Judge Taft or Judge Hammond to have attached any importance whatever to that circumstance. It was a railroad company and the sale of its property necesssarily put an end to its existence as a corporation. There was no reason why its stockholders, being for all practical purposes nothing more than private persons, interested in the proceeds of the property, and having no power to further transact business, as a corporation, except to pay the debts and divide the remainder of the assets among themselves, could not hold stock. Every reason of public policy which inhibits one corporation from taking stock in another, had ceased to exist. The taking of stock in the other corporation could have resulted in nothing except a re-sale of it to individuals, or a division of it among private persons. So, in the case of *Mason* v. *Mining Co.*, the corporation had expired by efflux of time. It had no power to transact any more business as a corporation, except to wind up. There was no reason of public policy why it could not take stock in another corporation, as an incident to the exercise of that power, and the Supreme Court of the United States never once, in the opinion, made any reference to the want of authority to take stock in another corporation, as a basis

or reason for its decision. The ground of the decision was; that the power of sale, without anything more; implied that the sale should be for money, payable at the time of sale or on such terms as to credit as might be reasable under the circumstances. If there was any reason why stock could not be taken, it was because it was not within the contract, not because the law inhibited it, and that reason exists in this case, for these dissenting stockholders have never, in any manner, agreed to take anything for their property except money.

No courts in the Union, perhaps, have bestowed as much attention, investigation and labor upon the subject of corporations as those of New Jersey. That state is known to be the most prolific one of corporations in the country. Its courts are perfectly familiar with every phase of corporation law, and their opinions relating to that subject, come from men who are not only familiar with it, but have had vast experience. In the case of *Coler* v. *Railroad Co.*, 64 N. J. E. 117, above cited and analyzed, Emery, Vice-Chancellor, stated the practice in that state, in such cases as this, to be as follows: "My view is that this provision of the act as to credit would not include the right to sell for shares in a new company organized to take the assets, with a view of distributing these shares among the stockholders, and that the stockholder could not be obliged to share in such new enterprise if he did not wish to. In the case of such sales to new companies of the assets of a company on dissolution which have come before me, and any stockholder or creditor has objected to receiving the shares in the new company, I have refused to approve sales of the assets for stock in a new company, except upon the terms that as to every stockholder or creditor not desiring to take stock as his share on distribution, the purchaser must, as to such dissenting stockholder or creditor, pay in cash the same amount offered in stock, and that the total amount thus offered in stock is the fair value of the property in money. And if the *status* of the present case was that of proposed sale by trustees on dissolution, I should consider that a stockholder who declined to accept shares in the new company in satisfaction of his rights in distribution, must be offered in cash the par value of the new stock, and that

an offer of only thirty-five per cent. in cash of the par value could not be sufficient. In other words, so far as the court of chancery in its control. over the liquidation of corporations, insolvent or otherwise, has any right of review over fixing the basis of capitalization of the new company, it can only approve a capitalization on the basis of the actual present value in money of the property conveyed." But the court did not regard the case, then under consideration, as falling within that class, for the reason that all the stockholders had expressly agreed that everything which had been done might be done. Proceeding, the Vice-Chancellor said: "But the present case is not a sale by a trustee on dissolution, nor do I think it can be so treated. It is. a sale expressly authorized by our statutes and the charter of the company, in carrying out one of the express objects for which it was incorporated, viz., the sale of a road owned and operated in a foreign state under its charter; and, on the sale, another of the objects of the company is effected, viz., the acquiring of the shares of stock in another corporation. The sale has been approved by more than the proportion of stockholders required by the charter, and the consideration is to be received by the company, which, upon the sale, will hold the stock as its property for the equal benefit of all stockholders."

It remains now to consider certain other decisions which have been produced, in support of the proposition of the alleged power conferred upon corporations by section 3 of article 52, as amended, to purchase and hold stock in one another, authorizes a majority to sell for stock instead of. money. Upon them is predicated the argument that, independently of any act of acceptance on the part of the stockholders, a new subject of corporate power, created by subsequent law, is carried into the corporate contract, although the law makes it merely permissive. One of them is *Cross* v. *Railroad Co.*, 35 W. Va. 174, by which a statute authorizes a minority stockholder to cumulate his shares in voting for the election of officers, was held to be applicable to a corporation organized before the passage of that statute. It was a mandatory statute. It granted to the minority stockholder a privilege which he was authorized to exercise. As to him it was permissive. He was not bound to

claim it, but he was given the right to do so. As to the majority stockholders it was mandatory. It compelled them to submit to the exercise of the privilege allowed the minority stockholder. It was not a permission extended to the corporation. It was a modification of the franchise of the corporation, by way of regulation of the existing privileges. It was constitutional because it did not work any fundamental change in the object and purposes of the corporation. It remained the same corporation engaged in the same business. Its contract was neither enlarged nor restricted. Nor did it take from the majority any right of contract or property. It did not deprive them of the control of the corporation. They could still elect a majority of the directors. All that it did do was to give the minority stockholder a chance for representation on the board of directors, so that he could have a voice in the management of the business in which he was interested. That statute did not merely say it shall be lawful for a corporation to do certain things, if it saw fit to perform them. On the contrary, it said to the majority, "You must allow the minority stockholder to vote in your meetings in a certain way if he desires to do so." Another is *State* v. *St. Mary's Franco &c., Co.*, 51 S. E. 865, sustaining a statute, requiring non-resident corporations to appoint the Auditor of the State as their attorney in fact and pay him, for the use of the state, a fee. That wrought no change in the scope of the business, and, in so far as it required the payment of money, it was an exercise of the power to tax the privilege. Taxation is not taking private property for public purposes, without compensation. Such was the character of *Bank* v. *Owensboro*, 173 U. S. 636. None of that line of decisions will sustain the positions taken for the appellees. The statutes were all mandatory and none of them wrought any change in the general nature of the corporation contract. They affected, primarily, the contract between the state and the corporation, and only incidentally, if not merely technically, the contract subsisting among the stockholders.

As the holders of sixty per cent. of the stock, claim the benefit of section 83, added to chapter 54 of the Code by chapter 35 of the Acts of 1901, it becomes necessary to answer the objection of unconstitutionality in that act, as ap-

plied to corporations previously organized, which has been made by the appellants.    I see no ground upon which that objection can stand.    The state has expressly reserved the power to repeal any charter.    That reservation was in the statute at the time this corporation was organized.    The power to repeal includes the power to prescribe the mode of its exercise.    If the legislature sees fit to do that by authorizing a prescribed number of stockholders to effect it by a sale of all the property of the corporation, instead of declaring that, in some other way, the business of the corporation shall cease and determine, I know of no principle of law or right in the stockholder which is thereby disturbed in such manner as to enable him to complain.    If it vests power in the holders of sixty per cent. or more of its stock, to fix the price of the property, and they are not required to make public sale by way of auction, that probably would not make it unconstitutional.    They, in fixing the price, and the purchaser in taking the property at the price fixed, would act at their peril.    If they did not act in good faith, a court of equity could set the transaction aside.    Even the courts have the power, in the absence of a controlling statute, in the execution of their decrees, to provide for private, as well as public, sales.    Why may not the legislature legally vest that power in the majority of a corporation?

My conclusions, predicated upon the reasons above stated, are: first, that if section 3 of chapter 52, as amended, confers upon corporations any authority to purchase and hold stock in one another indiscriminately and without limit, it was not intended by the legislature that such power should be used by a majority of the stockholders of a corporation, organized under a contract not providing for the exercise of such privilege, or any number of them less than the whole, so as to work a fundamental change in the business, or purpose, of the corporation, without the consent of every holder of stock in the corporation: second, that the statute, under the construction given to it by my associates, enabling the majority of the stockholders to so use it, is unconstitutional and void to that extent, because the amendment of the charter, so imposed, is fundamental, since it virtually destroys property rights of the dissenting stockholder without making

compensation therefor, allows the corporation to cease exercising its franchises and still hold them, substitutes the stock of another corporation for the property in which the stockholder has an equitable interest, and virtually compels him to become a stockholder of a new corporation to which he never made himself a party: wherefore the power so exercised by the legislature indirectly through a majority of the stockholders is not within the statutory reservation of power to repeal, alter and amend charters of corporations. If a majority of stockholders in one corporation can do as it pleases with the property of their associates, utterly ignoring their contract rights, they can do it in any other corporation.