STATE *ex rel.* DEWEY PORTLAND CEMENT COMPANY

v.

D. PITT O'BRIEN, *Secretary of State*

(No. 10845)

Submitted September 27, 1956. Decided December 22, 1956.

*Fitzpatrick, Marshall, Huddleston & Bolen, E. A. Marshall, William C. Beatty, Gage Hillix, Moore & Park,* for relator.

*John G. Fox,* Attorney General, *Angus E. Peyton, Charles R. McElwee,* Assistant Attorneys General, for respondent.

*Stathers & Cantrall, Arch M. Cantrall, Charles C. Wise, Jr.,* and *C. H. Hardesty, Jr.,* amici curiae for Simpson G. M. C. Truck Co., Fairmont Auto Supply Co., and Sanitary Baking Co.

*McCamic & Tinker,* amicus curiae for Cooperative Transit Co. and Owl Office Outfitters.

BROWNING, PRESIDENT:

Relator, Dewey Portland Cement Company, seeks in this original proceeding in mandamus to compel the respondent, D. Pitt O'Brien, Secretary of State of West Virginia, to receive a certificate of amendment executed by relator's president, to issue his certificate reciting the resolution set forth in the certificate of amendment and to declare the amendments to the charter, increasing the authorized capital stock as set forth in the certificate of amendment, to be authorized by law.

Relator alleges its incorporation under the laws of the State of West Virginia, on November 19, 1906, and five subsequent amendments to its certificate of incorporation, the last of which, on July 1, 1937, authorized a total capital stock of $12,000,000.00 divided into 800,000 shares of common stock, of a single class of the par value of $15.00 per share. Relator then alleges a meeting of its stockholders on August 27, 1956, at which time, more than 66% of the outstanding common stock, the only class relator is authorized to issue, being represented by the holders thereof either in person or by proxy, a resolution was unanimously adopted authorizing the amendment of relator's charter to permit an increase in

the authorized capital stock from $12,000,000.00 to $15,-000,000.00, and, instead of being divided into 800,000 shares of a single class of the par value of $15.00, dividing the common stock into two classes: (1) 1,350,000 shares of Class "A" common stock of the par value of $7.50; and (2) 650,000 shares of Class "B" common stock of the par value of $7.50, all voting rights, except in instances not here pertinent, to be vested exclusively in the holders of Class "B" common stock.

This resolution, duly certified by the president of relator, was tendered to the respondent, with the proper fees, who refused to accept and file such, or to take any action in regard thereto.

On petition of relator, this Court issued a rule to show cause why a peremptory writ of mandamus should not be awarded against the respondent commanding that he perform the requested acts, returnable September 25, 1956, at which time the respondent appeared and demurred to the petition on the ground that Sections 22 and 66 of Article 1, Chapter 31 of the West Virginia Code, in so far as they authorize the issuance of nonvoting stock by a corporation, are unconstitutional in that they contravene the plain mandate of Article XI, Section 4 of the West Virginia Constitution.

The pertinent statutory provisions provide as follows:

Code, 31-1-22: "Every corporation, other than a banking institution, shall have power to issue one or more classes of stock or one or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value, with such voting powers, full or limited, or without voting powers and in such series and with such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the charter * * *."

Code, 31-1-66: "In all elections of directors of corporations each stockholder shall have the right to cast one.

vote for each share of stock owned by him and entitled to a vote, * * *; and on any other question to be determined by a vote of shares at any meeting of stockholders each stockholder shall be entitled to one vote for each share of stock owned by him and entitled to a vote, * * *."

Article XI, Section 4, of the Constitution of West Virginia provides: "The Legislature shall provide by law that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock, shall equal, or to distribute them on the same principle among as many candidates as he shall think fit: and such directors or managers shall not be elected in any other manner."

By his demurrer to the petition of the relator, the respondent admits all of the facts well pleaded therein. Code, 31-1-22, authorizes every corporation, except a banking institution, to issue nonvoting stock such as the Class "A" common stock which, by the amendment to its charter, the relator seeks to issue. Mandamus is a proper proceeding to compel an administrative officer to perform a duty clearly imposed by a valid statute. Thus the issue is squarely presented as to whether the portions of Code, 31-1-22, and 31-1-66, pertaining to the issuance of stock by a corporation, which denies to the owner of shares of such stock the right to vote at stockholders' meetings for the election of directors or managers of such corporation, is in conflict with Article XI, Section 4, of the Constitution. The respondent contends that the pertinent provisions of Article XI, Section 4, of the Constitution of this State, are plain and unambiguous and not subject to interpretation or construction. The relator says that Section 4 is ambiguous, and that any doubt as to the validity of the pertinent statutes

should be resolved in favor of their constitutionality because of the legislative and administrative construction of Article XI, Section 4, over a period of many years.

At common law, each stockholder in a private corporation had but one vote at a stockholders' meeting, no matter how many shares of stock he owned. Fletcher, Cyclopedia on Law of Private Corporations, 1931, Section 2045. The Legislature of the several states at an early date began to give consideration to this question, and provisions relative to it were later incorporated in some state Constitutions. As early as 1836, the Virginia General Assembly was considering the matter, and in the revised Code of 1849, Chapter 57, Section 10, it was provided that: "In a meeting of stockholders, each stockholder may, in person or by proxy, give the following vote on whatever stock he may hold in the same right, to-wit: one vote for each share of such stock not exceeding twenty, one vote for every two shares exceeding twenty and not exceeding two hundred, one vote for every five shares exceeding two hundred and not exceeding five hundred, and one vote for every ten shares exceeding five hundred."

By the Code of 1860, Chapter 57, Section 10, the prior Act was reenacted to give "one vote for each share of such stock not exceeding ten, and one vote for every four shares exceeding ten." At the first session of the Legislature of this State, by Chapter 83, Section 22, Acts of the Legislature, 1863, the rule was again changed to provide for "one vote for every share of stock not exceeding one hundred; and one vote for every four shares exceeding one hundred." The Code of 1868, Chapter 53, Section 44, provided that there should be "one vote for every share of stock held in such company."

Reverting to the Acts of 1864, Chapter 43, we find the first action by the Legislature of this State permitting the stockholders of a corporation to issue more than one type of stock. Therein it was provided that: "The stockholders of any corporation now existing in this state, or which may be hereafter formed therein pur-

suant to law, may, by by-law or regulation passed in general meeting, provide for the issue of preferred stock, upon such terms and conditions, and with such stipulations and regulations respecting the preference to be given to such stock in regard to future dividends or otherwise as by the said by-law or resolution they may see fit to prescribe or agree to * * *." This same provision without substantial change is found in Chapter 53, Section 16, of the Code of 1868. This was the Act in force in this State when Article XI, Section 4, was adopted by the people of the State, and became a part of the Constitution in 1872.

By the Acts of 1872-73, Chapter 181, approved December 20, 1873, one year after the adoption of the constitutional provision, the Legislature adopted the following provision: "That in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote in person or by proxy for the number of shares of stock owned by him for as many persons as there are directors or managers to be elected, or to cumulate said shares and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner, and on any other question to be determined at any meeting of stockholders, if a vote by stock be demanded upon such question by any stockholder, every stockholder may in person or by proxy give the following vote on whatever stock he may hold in the same right, that is to say one vote for every share of stock held in such company." By the Acts of 1882, Chapter 96, the general corporation law of this State was reenacted with the preferred stock Section of 1864, and the above quoted Section of 1872-73, remaining unchanged.

Chapter 35, Section 5, of the Acts of 1901, after repeating the earlier provisions as to the authorization for the issuance of preferred stock, amended Section 16,

Chapter 53, of the Code, to contain this significant clause: "* * * and with or without the right to vote in stockholders' meeting, * * *."

Then by Chapter 86 of the Acts of 1925, Regular Session, the right to limit voting power was extended to non par stock with this language: "* * * authorize the issuance of non par value stock on such terms and conditions, and with or without the right to vote in stockholders' meetings * * *."

It is evident from the revisers' note that the Code Commission of 1921 had some difficulty in reconciling the legislation that had been enacted prior to that time with Article XI, Section 4, of the Constitution. The note reads in part as follows: "The weight of modern judicial opinion seems to hold such a provision unconstitutional, but these decisions, while well reasoned in many respects, seem to ignore the flexibility of a state constitution to meet changing public conditions, and for this reason do not seem to give as much weight as we think should be given to the real purpose of the provision, which was to secure the right of cumulative voting. It is thought if its true weight is given the purpose in mind, and the flexibility of state constitutions to meet changing public conditions is not forgotten, that the provision respecting preferred stock is constitutional, especially where there has been a long existing legislative policy in harmony with this statute, which has induced many corporations to adopt its provisions. Attention is also called to the fact that the constitutional provision referred to relates only to voting for directors, and does not relate to the right to vote on other corporate acts."

Interesting also is an article written by the Chairman of that Commission, approximately two years subsequent to the adoption of the Code of 1931, in 40 W. Va. Law Quarterly 97. He stated *inter alia* that: "However, the report of the code commission carrying into the revision the provisions of the Acts of the Legislature 1901 was not adopted by the legislative committee or the legislature, but instead the provisions of a recent Delaware

statute were bodily inserted in the West Virginia Code. If the Legislature had set out with the sole object of disregarding all constitutional obligations assumed by its members and defying the provisions of the section of the Constitution quoted, language more apt for the purpose than that adopted could not have been found." The writer, referring to the Acts of 1872-73, said: "* * * The legislative act mentioned did not expressly confer upon corporations the power to deprive the owner of any class of shares of the right to vote, but, nevertheless, the practice arose soon after the adoption of the constitution of 1872, of chartering West Virginia corporations with authority to issue preferred shares, by the terms of which they were deprived of the right to vote at any meeting of the stockholders.* * *" The authority for that statement is not given, and this record does not show that any charter was granted by the Secretary of State of West Virginia, authorizing the issuance of non-voting stock of any kind prior to the year 1903. After that date, the respondent admits by his demurrer to the petition that such became the routine practice by the Secretary of State, first as to preferred stock, and, more recently, common stock also.

In *Cross* v. *W. Va. Cent. & Pa. R'y. Co.*, 35 W. Va. 174, 12 S. E. 1071, (1891), this Court held that by the "last clause" of Section 4, Article XI, the owner of shares of stock in a corporation could not be deprived of the right to vote such shares by the cumulative method in an election of directors of the corporation. It was stated in the opinion: "I see no reason why this *latter clause* should not be construed as of its own force controlling the manner of electing directors under this charter prospectively. But if it needed legislative enactment to put this constitutional provision in force this was made in the language of the constitution by act of December 20, 1873. * * *" (Italics supplied.) There is authority upon this issue in other jurisdictions which we have carefully considered.

The earliest case we find is *State ex rel. Frank* v.

*Swanger*, 190 Mo. 561, 89 S.W. 872, 2 L.R.A., N.S., 121, decided in 1905. The Missouri Constitution, which was construed by that decision, was in these words: "In all elections for directors or managers of any incorporated company, each shareholder shall have the right to cast as many votes in the aggregate as shall equal the number of shares so held by him or her in said company, multiplied by the number of directors or managers to be elected at such election; and each shareholder may cast the whole number of votes, either in person or by proxy for one candidate, or distribute, such votes among two or more candidates; and such directors or managers shall not be elected in any other manner." The court in holding that corporations could, by their charter, if authorized by legislative enactment, deprive holders of preferred stock of voting rights without violating that constitutional provision, said: "Properly understood, we think §6, art. 12, of the Constitution means only that every stockholder entitled to vote at any corporate election is entitled to vote his share on the cumulative plan, but does not mean that the stockholders themselves in the organization of the company may not voluntarily agree that certain preferred stock shall be issued and that the holders thereof shall not have the right to vote." For that statement, *Wright* v. *Central California Colony Water Company*, 67 Cal. 532, 8 P. 70, is cited.

The principal issue in the *Wright* case was whether a shareholder could be deprived of the right to cumulate his votes. The court held, upon that issue, that stockholders could not be deprived, by majority action, of the right to cumulate their votes in the election of directors. Article XII, Section 12, of the 1897 Constitution of California, is similar to the provisions of Article XI, Section 4, of our Constitution. The precise question decided by the Missouri court, and the one that is before this Court, was not considered in the *Wright* case.

Neither is the recent case of *E. K. Buck Retail Stores* v. *Harkert*, 157 Neb. 867, 62 N.W. 2d. 288, in point, although certain language in the opinion supports the rela-

tor's position. The pertinent provisions of the Nebraska Constitution are identical with ours, but in the *Buck* case the issue decided was not whether a Nebraska statute was invalid because of a provision therein that was in contravention with that part of the Constitution relating to the right of the holder of a share of stock to cast a vote in all elections for directors or managers. That case involved the validity of an agreement between the Buck interests and the Harkert interests by which the former received forty per cent of the stock of Harkert's Houses, a Nebraska corporation, and the latter sixty per cent of that stock. The agreement also provided that there were to be four directors elected, and that each of these parties would have the right to designate two directors of the corporation. That *Buck* v. *Harkert* is not in point is shown by this statement in the opinion: "It will be noted that each share of stock was given one vote, the right to cumulate was not denied, and for aught the record shows, the voting power of the stock was in no way reduced."

In 1911, the Supreme Court of Delaware, in *Brooks* v. *State ex rel. Richards,* 79 Atl. 790, construed a constitutional provision of that state, adopted in 1897, to determine the validity of a subsequent statute by which the holders of preferred stock in corporations were deprived of voting rights. The Delaware Constitution directed that: "in all elections for directors or managers of stock corporations, each shareholder shall be entitled to one vote for each share of stock he may hold." It is interesting to compare that constitutional provision with the first part of Article XI, Section 4, of the Constitution of this State: "The Legislature shall provide by law that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, * * *."

The Delaware court held the statute unconstitutional and rejected the contention of the defendant in error that the provision of the Delaware Constitution really

meant that in all elections for directors or managers of stock corporations, each shareholder *having the right to vote shall* be entitled to one vote for each share of stock he may hold. The same contention is made in this proceeding.

The people of the State of Illinois adopted a Constitution in 1870, which contained the following provision: "* * * The General Assembly shall provide, by law, that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner." A comparison of the provisions of the Illinois Constitution and Article XI, Section 4, of the Constitution of this State, which was adopted two years later, indicates either that Section 4 was taken almost verbatim from the Illinois Constitution, or that both came from a common source. The pertinent provision of the Illinois Constitution was construed by the Supreme Court of that state in 1922 in *People ex rel. Watseka Telephone Company* v. *Emmerson,* 302 Ill. 300, 134 N.E. 707, 21 A.L.R. 636. The court rejected the contention that the constitutional provision was primarily a guarantee of the right of stockholders to cumulate their votes, and refused to grant a writ of mandamus directing the Secretary of State to approve an amendment to the corporate charter of the Watseka Telephone Company, which provided that the owners of preferred stock in that corporation should be deprived of the right to vote for directors or managers, upon the ground that such amendment was in conflict with the Illinois Constitution.

In the recent case of *Wolfson* v. *Avery,* 6 Ill. 2d. 78, 126 N.E. 2d. 701, the Illinois court, in approving its decision

in the *Emmerson* case, said: "* * * In People ex rel. Watseka Telephone Co. v. Emmerson, 302 Ill. 300, 134 N.E. 707, 709, we had occasion to construe the present section of the constitution in deciding whether a corporation could provide for preferred stock without any right in the owner to vote for directors. It was contended that the phrase 'every stockholder,' as used in section 3, should be construed to mean 'every stockholder entitled to vote.' It was held, however, that under this provision of the constitution all stockholders must have the right to vote for directors. We observed that 'If the convention intended that only those stockholders who were given the right to vote by the charter or articles of incorporation adopted by the company were included, it would have been perfectly easy to word this section so as to convey this meaning, but instead of so wording it the convention used the language, 'every stockholder shall have the right to vote, in person or by proxy, * * * for as many persons as there are directors or managers to be elected,' and followed this with a provision as to cumulating said shares."

An examination of the Journal of the Constitutional Convention shows that, while the other Sections of Article XI, which were ultimately approved, were discussed freely, no member commented upon Section 4.

This Court is not unmindful of the weight that must be given to the construction of a constitutional provision by the Legislature, and by an official of the Executive branch of the government. *Leonhart* v. *Bd. of Ed.*, 114 W. Va. 9, 170 S. E. 418, *State* v. *Harden*, 62 W. Va. 313, 58 S. E. 715; *Lipscomb* v. *Nuckols*, 161 Va. 936, 172 S.E. 886. Nor are we unmindful of the rule that in construing a statute if there is any doubt as to its constitutionality, that doubt should be resolved in favor of its validity. *State* v. *Harrison*, 130 W. Va. 246, 43 S. E. 2d. 214; *State* v. *See*, 129 W. Va. 722, 42 S. E. 2d. 31. However, great weight is given to legislative construction of a constitutional provision only when it is contemporaneous with or follows soon after, the adoption of the constitu-

tional provision in question. *State Road Comm.* v. *County Court,* 112 W. Va. 98, 163 S. E. 815; *Leonhart* v. *Bd. of Ed., supra; Roanoke* v. *Michael's Bakery Corp.,* 180 Va. 132, 21 S. E. 2d. 788.

Assuming that an ambiguity existed in Article XI, Section 4, then Chapter 181, Acts of 1872-73, which followed approximately one year after the adoption of the constitutional provision, would be entitled to great weight but that Act not only repeated the language of Section 4, but went further and provided that, on questions other than the election of directors or managers, "if a vote by stock be demanded", every stockholder should have the right to cast "one vote for every share of stock held in such company." It was not until twenty-nine years after the adoption of the constitutional provision that the Legislature first inserted the phrase "and entitled to a vote." Furthermore, there is nothing in this record to indicate an administrative interpretation of Section 4 by the Secretary of State by issuing charters to incorporated companies which authorized the denial of voting rights to any person who owned stock therein until thirty-one years after this Section was adopted.

This Court finds that Article XI, Section 4, of the Constitution of the State, is clear and unambiguous, and there is no occasion to resort to the rules of construction in ascertaining its meaning. The Legislature was directed in plain and simple language to "provide by law that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected,* * *." There was nothing new in the provision that every stockholder should have the right to cast one vote for every share of stock which he held, since that had been provided generally by the Code of 1868, but, in view of the varied provisions upon this subject prior to that time, the members of the constitutional convention saw fit to secure that right to all shareholders by inserting such a provi-

sion in the organic law of this State, but applicable only in elections of directors or managers. The provision in that part of the Section, which has been quoted, giving the right of a shareholder to vote by proxy, as well as the provision that each shareholder should have the right to vote the number of shares of stock which he owned for "as many persons as there are directors or managers to be elected,", were new. If ten directors were to be elected, and there were twenty candidates, a stockholder who owned ten shares could cast ten votes for ten of those candidates.

Next follows the disjunctive particle "or", denoting an alternative choice, not in the right in every stockholder to cast one vote for each share of stock that he held, but to vote in a different manner than the way provided immediately prior to the use of the word "or". Thereafter, it was provided that the shareholder could "cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock, shall equal, * * *." By that provision, the shareholder owning ten shares, where ten directors were to be elected, could cast one hundred votes for one candidate if he so desired.

Again comes the disjunctive particle "or", by which the shareholder could "distribute" the shares of stock which he held in elections for directors or managers of the corporation, and, if he owned ten shares and ten directors were to be elected, he could cast ninety votes for one candidate and ten for another. Following the colon is the emphatic provision "and such directors or managers shall not be elected in any other manner."

Although the subject matter is different, the issue in this proceeding and the problem considered in *C. & O. Railway Co.* v. *Miller, Auditor*, 19 W. Va. 408, are similar. In that case, the Court passed upon the constitutionality of an Act of the Legislature providing that no taxation should be imposed upon the property of the C. & O. Railway Company by the State until the profits of that company amounted to ten per cent of the capital of the

company. The pertinent constitutional provision was Article VIII, Section 1, of the Constitution of 1863, which reads in part as follows: "* * * Taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as directed by law.* * *" It was contended by the Railway Company that the words "all property" should be construed as meaning all property that is taxed, just as in this proceeding it is contended that Section 4, of Article XI, means not that "every stockholder shall have the right to vote", but that it means that every stockholder "entitled to a vote" shall have such right. This Court held in the *Railway Company* case that the language used in the Constitution was unambiguous, and that it was not within the province of this Court to read words into it. In the opinion, it was said: "The language of the Constitution being clear and free from ambiguity, and the words used, due regard being had to their grammatical construction, embodying, as they do, a definite meaning, which involves no absurdity and no contradiction between different parts of the same instrument, the meaning apparent on the face of the instrument is the one, which alone, we are at liberty to say was intended to be conveyed, and we are not at liberty to look beyond the instrument itself. * * *" It was further said in the opinion that: "Much respect as we have for the Legislature, a co-ordinate branch of the government, we must pay greater respect to the sovereign will of the people expressed in the Constitution, which they have adopted for their own government. And where the court sees, that the Legislature has plainly violated that instrument, it is the highest duty of the court, plainly required by the written Constitution, which it is its sworn duty to support, to pronounce such act of the Legislature unconstitutional. * * *"

The rule thus laid down in the *Miller* case has been approved by this Court many times. *Pt. Pleasant Bridge Co.* v. *Pt. Pleasant,* 32 W. Va. 328, 9 S. E. 231; *Coal and Coke Co.* v. *Tax Commissioner,* 59 W. Va. 605, 53 S. E.

928; *Clarksburg, etc. Railroad Co. v. Morris,* 76 W. Va. 777, 86 S. E. 893; *Central Realty Co. v. Martin,* 126 W. Va. 915, 30 S. E. 2d. 720; *Barlow v. Daniels,* 25 W. Va. 512; *State v. Cottrill,* 31 W. Va. 162, 6 S. E. 428; *Lovings v. N. & W. Ry. Co.,* 47 W. Va. 582, 35 S. E. 962; *State v. Ellison,* 49 W. Va. 70, 38 S. E. 574; *Bee v. Huntington,* 114 W. Va. 40, 171 S. E. 539; *State v. Morton,* 140 W. Va. 207, 84 S. E. 2d. 791; *Flesher v. Board of Review,* 138 W. Va. 765, 77 S. E. 2d. 890; *State ex rel. Trent v. Sims,* 138 W. Va. 244, 77 S. E. 2d. 122; *Hereford v. Meek,* 132 W. Va. 373, 52 S. E. 2d. 740.

It should be emphasized that while Article XI, Section 4, of the Constitution, is a clear, emphatic command to the Legislature that every stockholder shall have the right to vote for the number of shares of stock owned by him in all elections for directors or managers of incorporated companies, it makes no provision as to the right of shareholders to vote upon any other action of a corporation. While Chapter 181 of the Acts of 1872-73, went further and gave the right to vote upon other questions, under certain circumstances, Section 4 did not require that the Legislature go that far.

It is apparent from an examination of statements contained in some texts and court opinions in other jurisdictions that some confusion exists between the right of a stockholder to vote his stock in the manner specified in a Constitution or statute, and the right of a stockholder to enter into a bona fide agreement with other stockholders, as to the manner in which he shall or shall not use that privilege. Such an agreement, however, does not change the character of the stock, but affects only the privilege of the person who owns it.

It is undoubtedly true that as a result of the long delay in seeking an adjudication by this Court of the issue presented in this proceeding, there are many charters of incorporated companies in existence providing for limited or no voting privileges by some of their shareholders. If the provisions of Article XI, Section

4, are not now expressive of the will of the people of this State, resort may be had to Article XIV, of the Constitution, wherein provision is made for the repeal or amendment of any part thereof.

The language of Article XI, Section 4, being clear and free from ambiguity, no official of the Executive branch of the government, no legislative body, nor this Court, all of which exist only by virtue of the Constitution of this State, has the power to change its provisions. If any should attempt to do so, we repeat, with approval, the language used in *C. & O. Railway Co.* v. *Miller, Auditor, supra,* quoting from *People* v. *Purdy,* 2 Hill 35: "in this way a solemn instrument—for so I think the Constitution should be considered—is made to mean one thing by one man and something else by another, until in the end it is in danger of being rendered a dead letter; and that too, where the language is so plain and explicit, that it is impossible to mean more than one thing, unless we first lose sight of the instrument itself, and allow ourselves to roam at large in the boundless fields of speculation. For one I do not venture upon such a course. Written constitutions of government will soon come to be regarded as of little value, if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power will prove a failure."

This decision renders invalid the provisions contained in Code, 31-1-22, Code, 31-1-66, and all other Acts of the Legislature, wherein it is provided that any limitation may be placed upon the right of an owner of a share of stock in any corporation, created under the laws of this State, to vote for directors or managers of such corporation, but such Acts are, by this decision, made invalid to that extent only, and all parts of such Acts not in conflict with the provisions of Article XI, Section 4, of the Constitution of this State, remain in full force and effect.

The relator having failed to show a clear legal right to the relief sought, the writ will be denied.

*Writ denied.*

GIVEN, JUDGE, dissenting:

Being of the very definite view that the Court has unnecessarily struck down a statute of long standing and great usefulness and, in doing so, unnecessarily precludes the use and application in this State of an important principle of corporation law, one that has long been recognized and applied in this State, I must attempt to state the bases of my dissent. To indicate the sharp, abrupt impact that may be expected to the heretofore existing practice of issuing stock with limited voting rights, it may be pointed out that since 1948 approximately one hundred twenty corporations have been granted charters containing provisions authorizing the limiting of rights of stockholders to vote, and that between the time of the adoption of the Constitution and 1948, several hundred other corporations have been authorized by the State to issue such stock. Unless precluded by Section 4 of Article XI of the Constitution, a stockholder may be limited as to his right to vote his stock. "A stockholder has no right to vote at corporate meetings, whether the stock is common or preferred, if it is so stipulated when the stock is issued, for the stipulation is then a term of his contract * * *". Vol. 3, Private Corporations, Page 1996, Clark and Marshall. See 2 Thompson on Corporations, 3 Ed. Section 949.

It appears unmistakably plain to me that the majority have applied the force of Section 4 of Article XI to a situation not actually dealt with and not actually intended to be covered by the language thereof. By its own terms, that section of the Constitution, quoted in the majority opinion, relates to the "Rights of Stockholders", not to restrictions placed on the legislative branch of the government with reference to its powers of controlling the organization or constitution of private corporations. The only such restrictions were placed in Section 1 of the same article: "The Legislature shall provide for the organization of all corporations hereafter to be created, by general laws, uniform as to the class to which they relate; but no corporation shall be created

by special law * * *". "Rights of Stockholders", dealt with by Section 4, can not arise until a time subsequent to the creation of the corporation. A stockholder can acquire such rights only by subscribing to the articles of incorporation, as an organizer, or by the purchase of stock, the terms of such purchases being usually set out in the articles of agreement contained in the charter. The matter of the creation of a private corporation is one between the State and the incorporators. The "Rights of Stockholders" among themselves is a wholly different thing, and is what is intended to be regulated by Section 4 of Article XI. I need not, of course, cite authorities to the effect that the power of the Legislature with reference to the chartering of private corporations is limited only by applicable provisions of the Constitution.

The evil sought to be avoided by Section 4 of Article XI, and this is clearly demonstrated in the majority opinion, was to prevent a majority of stockholders depriving a minority of rights and property by prejudicially or selfishly manipulating the business affairs of the corporation. Such evil was attempted to be avoided by Section 4 by guaranteeing unto the minority stockholders the right to vote for directors and managers cumulatively and distributively, in accordance with the rights acquired by them respectively, in the purchase of their shares of stock, and not to prevent the issuance or purchase of shares of stock upon any particular condition or limitation relating to the right to vote. In other words, the intention of Section 4 is to protect the rights of minority stockholders as to such rights as were acquired by them in the purchase of stock, and not to deny them the right to freely contract as to what rights should be or should not be included in the purchase agreement. The language of Section 4, to me, at least, makes this conclusion irrefutably certain. I think, too, that the attempt of the majority to analyze the language of that section clearly demonstrates its lack of application to any question relating to the issuance or purchase of stock, or to the creation or organization of any corporation, but establishes that it relates only to the "manner"

of voting in accordance with rights inherent in the contract of purchase.

As above noticed, by its own language Section 4 attempts to regulate only "Rights of Stockholders" in the "manner" of voting for directors or managers, and not the "manner" in which the Legislature may exercise its power relating to the creation or organization of corporations. Notice, too, the cautious absence from the language of any limitation on such legislative power. Only the "manner" of the voting, "in person or by proxy", cumulatively and distributively, of "stockholders", is mentioned, and that alone can be the purpose or object of the language. Yet the majority read into the section a wholly different purpose, a purpose foreign to the stated object of the section. Only by doing so can they reach the conclusion that the pertinent statutory provision is unconstitutional. Is it not incontestably certain that had the framers of the constitutional provision attempted or intended to limit the right or power of the Legislature in the respect indicated by the majority, they would have done so in language not involving rights of stockholders to vote cumulatively and distributively, rights entirely foreign to any question of legislative power, and would have made such attempt in the section specifically designed to define such limitations?

Although I agree that the language of Section 4 is clear and unambiguous, I am of the view that the conclusion reached by the majority is not in accord with the plain language used, and that such conclusion can not be reached save on the basis of ambiguous language, for the simple reason that the majority imply or import thereto a meaning not found therein, not related to the subject thereof, but entirely foreign to the matters dealt with. It may also be pertinent to note that the plain intent accorded the language by the majority opinion is not the plain intent accorded it by almost every Legislature of this State since the adoption of the Constitution, as will be hereinafter shown; by every administrative officer heretofore charged with the duty of issuing cor-

porate charters; by at least two prior decisions of this Court; by the hundreds of members of the Bar of this State who have assisted in the organization of numerous private corporations; and by decisions of the highest courts of several jurisdictions. In such circumstance, the rules relating to construction and interpretation of ambiguous language should be applied. One of such rules relates to long-time practical construction and application of such a provision. "3. If this construction of said constitutional provisions could be regarded as being doubtful, the doubt would have to be resolved in favor of such legislative power, and legislative construction thereof, made manifest by the exercise of such power throughout a long period of years, acquiesced in by the people of the State and its courts, would now forbid judicial disturbance thereof." *State ex rel. Hallanan, State Tax Commissioner* v. *Rocke, Assessor,* 91 W. Va. 423, 113 S. E. 647. The "* * * practical construction given to the laws by public officials is entitled to, and has, great weight with us. City of Norfolk v. Bell, 149 Va. 772, 780, 781, 141 S. E. 844; South East Public Service Corp. 1. Com., 165 Va. ___, 181 S. E. 448, 452." *Hunton* v. *Commonwealth,* 166 Va. 229, 183 S. E. 873. See *State Road Commission* v. *County Court of Kanawha County,* 112 W. Va. 98, 163 S. E. 815.

The petition herein alleges, in effect, and the demurrer thereto admits, that since about 1872, the date of the adoption of the Constitution, of which the questioned provision is a part, it has been the general and universal custom and practice of the State, through its proper officials, to issue corporate charters authorizing the issuance of stock, limiting the rights of holders thereof as to voting rights. In so far as the record in this case is concerned, in not one single instance was that universal administrative practice questioned, between the time of the adoption of the Constitution and the time of the institution of this action. The legislative policy is just as clear and definite.

In 1864, before the adoption of the present Constitu-

tion, the Legislature of the State, by Chapter 43, Section 1, provided that "stockholders of any corporation * * * may, by by-law or regulation * * * provide for the issue of preferred stock, upon such terms and conditions * * *" as the parties "may see fit to prescribe or agree * * *". Section 16 of Chapter 96 of the Acts of 1882 authorized the issuance of stock "on such terms and conditions * * *" as the stockholders "may deem proper". This language of Section 16 became part of Chapter 53, Section 16 of the Warth, 1891 Code, and of Chapter 53, Section 16 of the Warth, 1899 Code.

By Chapter 35, Section 16 of the Acts of 1901, the language of old Section 16 was amended to read: "The agreement of incorporation and the certificate of incorporation issued by the secretary of state, or the stock holders in general meeting, by a resolution or by-law, may provide for or authorize the issuing of preferred stock on such terms and conditions, and with or without the right to vote in stockholders' meeting * * *". This language became a part of the language of Section 16 of Chapter 53 of the Code of this State of 1906, of the Code of 1913 and of the Code of 1923, and remained the law of this State until the adoption of the 1931 Code, 31-1-22, the pertinent language of which was then amended to read: "Every corporation * * * shall have power to issue one or more classes of stock or one or more series of stock within any class thereof * * * with such voting powers, full or limited, or without voting powers * * * as shall be stated and expressed in the charter, or in any amendment thereto, or in the resolution or resolutions * * *". Such change has remained a part of the Code since 1931. Thus, there can be no wondering doubt as to the universal legislative policy relating to the practice of the State, through its administrative officers, in the issuing of corporate charters containing agreements limiting the rights of stockholders to vote, or as to the legislative intent relating to such policy from the time of the adoption of our present Constitution until this date.

The constitutional provision involved, Article XI, sec-

tion 4, was considered by this Court in *Germer* v. *Triple-State Natural Gas & Oil Co.*, 60 W. Va. 143, 54 S. E. 509, and *Cross* v. *W. Va. Cent. & Pa. R'y. Co.*, 35 W. Va. 174, 12 S. E. 1071. In neither of these cases was the exact question here involved considered by the Court. The Court, however, clearly treated the constitutional provision as one relating to the manner of the exercise by stockholders of the right to vote, that is, cumulatively and distributively, and not to the limiting of powers of the Legislature. This seems to be made certain by the following language used in the opinion in the *Cross* case, speaking of the last clause of the constitutional provision: "I see no reason why this latter clause should not be construed as of its own force controlling the manner of electing directors under this charter prospectively. But if it needed legislative enactment to put this constitutional provision in force this was made in the language of the constitution by act of December 20, 1873. See Acts 1872-73, c. 181, p. 535. This was re-enacted in the general law of March 14, 1881. See section 56, c. 17, Acts 1881; also section 67, same act * * *". Thus, we have had not only a uniform administrative and legislative policy existing from the time of the adoption of the Constitution, but the clear sanction of this Court as to the unquestioned practice of the State, through its administrative officers, to authorize the issuance of corporate stock with limited voting rights, for the same period of the history of our State.

In *State ex rel. Frank* v. *Swanger*, 190 Mo. 561, 89 S. W. 872, 2 L.R.A., N.S., 121, in considering the identical question here considered under a constitutional provision to the same effect as the constitutional provision here involved, the Court held: "Under Rev. St. 1899, §§1312, 1332, as amended by Laws 1901, pp. 91, 92, and Section 1333, conferring on the stockholders power to issue preferred stock, and to fix its preferences, priorities, classification, and character, the stockholders of a corporation were entitled to provide that preferred stock should not carry voting power, notwithstanding Const. art. 12, §6, and Rev. St. 1899, §953, providing that at

all elections for directors of a corporation 'each stockholder' shall be entitled to cast as many votes as he has shares in the company, and Const. art. 12, §§8 and 12, providing that the stock shall not be increased without the consent of the holders of the larger number in value of the stock, and that preferred stock shall not be issued without the consent of all the stockholders." In the opinion, the Court said: "* * * Properly understood, we think section 6, art. 12, of the Constitution means only that every stockholder entitled to vote at any corporate election is entitled to vote his share on the cumulative plan, but does not mean that the stockholders themselves in the organization of the company may not voluntarily agree that certain preferred stock shall be issued and that the holders thereof shall not have the right to vote. Wright v. Central California Water Company, 67 Cal., loc. cit. 535, 8 Pac. 70. When we recall the historic setting of this provision in our organic law, and the obvious purpose of its insertion therein, we can discover no intention to take away a long-established right of stockholders at common law to make their own agreements, as long as they did not collide with some settled principle of law, organic or statutory, and which does not contravene public policy, but concerned themselves only. Miller v. Ratterman, 47 Ohio St. 157, 24 N. E. 496; Re Newark Library Ass'n, 64 N. J. Law, 219, 43 Atl. 435. This view is reinforced by the construction placed by courts in the United States upon the nature of preferred stock * * *". In addition to the cases cited in the above quotation from the opinion in the *Swanger* case, see *E. K. Buck Retail Stores* v. *Harkert,* 157 Neb. 867, 62 N. W. 2d 288; *General Investment Co.* v. *Bethlehem Steel Corp.,* 87 N. J. Eq. 234, 100 A. 347.

Assuming, however, that the intention of the framers of the Constitution was to prohibit the State from issuing a charter to a private corporation authorizing the issuance of stock possessed of limited voting rights, and that the language of Article XI, Section 4, actually means just that, I think there remains no valid reason why the stockholders of a private corporation can not waive such

constitutional right, by an express agreement to that effect, either in the articles of incorporation or by a purchase of stock contract. I need cite no authorities to the effect that, with certain exceptions not here pertinent, constitutional rights may be waived, if done with intelligent understanding. Even those charged with serious criminal offenses are usually permitted to do so.

As has often been noticed, any question as to public policy is one for the Legislature, not one for the Courts. No one would contend, of course, that any constitutional provision should be permitted to be whittled away by public or legislative policy, or otherwise, but all authorities agree that long uniform administrative interpretation and practice, concurred in by the public, and clearly approved by legislative policy, with reference to the meaning of a constitutional or statutory provision, should be given great weight by the Courts when faced with the duty of determining the meaning of the language of such provision. I think the rule especially applicable where, as here, the result of a change in the long established practice and policy will almost certainly result in driving corporations from the State, prevent others from coming into the State, and deprive citizens of advantages and profits to which they would otherwise be entitled. The resulting damages to the State and its citizens will be, in quantity, vast and incalculable, and hopelessly irreparable.

Being of the views indicated, I respectfully dissent.